Isabelle B. Krome v. Commissioner. William H. Krome v. Commissioner. Estate of William J. Krome, Isabelle B. Krome, Executrix v. Commissioner.
Krome v. Commissioner
Docket Nos. 14774, 14775, 14776.
United States Tax Court
1950 Tax Ct. Memo LEXIS 267; 9 T.C.M. (CCH) 178; T.C.M. (RIA) 50064; February 28, 1950
David E. Scoll, Esq., 50 Broadway, New York, N. Y., for the petitioners. Newman A. Townsend, Jr., Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: In these proceedings, which were consolidated, respondent determined the following deficiencies in income tax: Docket No.
Year
Deficiency
14774
1945
$ 578.78
14775
1943
1,732.06
1945
1,438.53
14776
1943
959.08
1945
5,249.64
The questions presented are: (1) Are the petitioners in Docket Nos. 14774, 14775 and 14776 entitled to deductible losses in 1945 under section 23 (e) (1), Internal Revenue Code, because of damage from a hurricane in that year to certain fruit groves used in a trade or business, and if so, in what amount? (2) Is the petitioner in Docket No. 14776 entitled to a deductible loss in 1945 under section 23 (e) (3) of the code, because of damage from *269 a hurricane in that year to certain shade trees not connected with the trade or business, and if so, in what amount? (3) Are the petitioners in Docket Nos. 14775 and 14776 entitled to net operating loss carry-backs from 1945 to 1943? A portion of the facts have been stipulated. Findings of Fact During 1945 Isabelle B. Krome, the petitioner in Docket No. 14774, was a resident of Homestead, Florida. Her income tax return for that year was filed with the collector of internal revenue for the district of Florida. During 1943 and 1945 William H. Krome, the petitioner in Docket No. 14775, was a resident of Homestead, Florida. His income tax returns for both years were filed with the collector of internal revenue for the district of Florida. He is the son of William J. Krome, now deceased, and Isabelle B. Krome. William J. Krome died October 2, 1929. Isabelle B. Krome is the executrix of his estate. For the years 1943 and 1945 the petitioner in Docket No. 14776, the estate of William J. Krome, deceased, filed a fiduciary income tax return with the collector of internal revenue for the district of Florida. During 1945 the petitioners owned and operated a number of avocado, mango, *270 and citrus groves near Homestead, Florida. The groves were well maintained. On September 15, 1945, a severe hurricane passed directly through this area, with winds reaching 150 miles per hour. The hurricane destroyed some trees in petitioners' groves, uprooted some, twisted some, took of the tops of some, large limbs of others, and smaller branches, foliage and bark of others. Similar damage was suffered by certain ornamental shade trees on the property of Isabelle B. Krome. None of the hurricane damage to any of the petitioners herein was compensated for by insurance. After the hurricane William H. Krome had petitioners' trees which had been uprooted, both the grove trees and the shade trees, reset in the ground. Those which had damage to the top or to the limbs, he allowed to sprout first to see if they would live and then had them cut back and pruned. Some of the trees died almost immediately, others subsequently died, others have made varying degrees of recovery. Petitioners have received smaller crops of fruit, if any, from their trees since the hurricane than they received from them before the hurricane. Some of the trees which were uprooted or lost their tops or limbs may *271 become normal producing trees again in a period of years. Others may not. Meanwhile, most trees which were seriously damaged by the hurricane have been in a weakened condition and more vulnerable to strong winds or disease since that time. Mango and avocado trees have been known to produce fruit when over a hundred years old. It takes about seven years to bring either an avocado or mango to where it will pay its way. Lime trees start bearing crops about the fourth year. Petitioners' avocado, mango and citrus trees (other than the Krome and Kendall lime trees) have indeterminate productive lives, were not depreciated by petitioners, and are not subject to depreciation. The lime trees in the Krome and Kendall groves were depreciated by the petitioner William H. Krome at the rate of 3 per cent, and are depreciable at that rate. It was the practice of petitioners to maintain their groves in a state of high productivity and quality by replacing nonproductive trees and top-working other trees to newer and better varieties. The costs of rehabilitating the groves damaged in 1945 by hurricane have been deducted as business expenses by petitioners on their returns filed since 1945. On *272 January 15-17, 1946, petitioners had tables prepared in which was calculated the percentage of loss sustained by each of petitioners' groves from the hurricane. These tables were used on the returns for 1945. The tables were revised in the summer of 1946, and the revised tables included in the category of trees that had been destroyed trees that had died between the end of the hurricane and the summer of 1946. The rest of the information on which the tables were based was collected shortly after the September hurricane, before the uprooted trees were reset. (No losses have been claimed by petitioners on returns filed since 1945 for trees that died after the summer of 1946.) It was from these revised tables that petitioners computed the losses claimed in their amended petitions. Petitioners' count of trees destroyed and damaged in their fruit groves by the hurricane was accurate, and their method of computation of the percentages of loss to the groves from the hurricane was reasonable and accurate. Petitioners claimed deductible losses as follows (as revised on brief): ISABELLE B. KROME
Basis (Trees)
Per Cent
Deductible
9-15-45
of Loss
Loss
I. B. Krome (grove)
$ 2,400.00
53
$ 1,272.00
I. B. Krome (shade trees)
2,345.00
various
937.50
Rockdale
16,000.00
59.4
36/240 X 9,504 or
1,425.60
$ 3,635.10
WILLIAM H. KROME
Fisher
$ 3,000.00
60.6
$ 1,818.00
Krome & Kendall
2,247.57
62.1
1,395.74
Rockdale
16,000.00
59.4
74/240 X 9,504 or
2,930.40
$ 6,144.14
ESTATE OF WILLIAM J. KROME
Krome 13
$ 4,500.00
60.5
$ 2,722.50
Medora West
9,600.00
51.1
4,905.60
Medora North
11,200.00
64.7
7,246.40
Medora South
1,250.00
53.3
666.25
Ray Groves
11,000.00
68.7
7,557.00
Rockdale
16,000.00
59.4
130/240 X 9,504 or
5,148.00
$ 28,245.75
*273 Respondent computes the deductible losses as follows: ISABELLE B. KROME
Cost or Other Basis
Date
Depreciation
Adjusted Basis
Land
Trees
Acquired
1.25%
(Trees) 9-15-45
I. B. Krome
(grove)
$ 600.00
$ 1,800.00
5- 1-30
$ 568.80
$ 1,231.20
I. B. Krome
(shade trees)
Rockdale
WILLIAM H. KROME
Fisher
$ 750.00
$ 2,750.00
7- 5-38
$ 246.12
$ 2,503.88
Krome & Ken-
dall
2,247.57
Rockdale
ESTATE OF WILLIAM J. KROME
Krome 13
$ 500.00
$ 1,000.00
10- 2-29
$ 325.00
$ 675.00
Medora North
4,000.00
8,400.00
5- 1-30
2,654.40
5,743.60
Medora West
2,400.00
7,200.00
5- 1-30
2,275.20
4,924.80
Medora South [1]
2,148.53
(576.66)
6-21-38
Ray (10 acres
avocados) [2]
500.00
1,500.00
10- 2-29
468.00
1,032.00
Ray (20 acres
citrus) [2]
1,000.00
2,000.00
1-13-30
2,000.00
Rockdale
ISABELLE B. KROME
No. of Trees
No. of Trees De-
Per Cent of Total
Deductible
Before Storm
stroyed by Storm
Trees Destroyed
Loss
I. B. Krome
(grove)
480
$ 0
I. B. Krome
(shade trees)
0
Rockdale
0
$ 0
WILLIAM H. KROME
Fisher
865
18
2.08
$ 52.08
Krome & Kendall
3,737
85
2.28
51.24
Rockdale
$ 103.32
ESTATE OF WILLIAM J. KROME
Krome 13
499
22
4.41
$ 29.77
Medora North
2,352
69
2.93
168.29
Medora West
1,219
72
5.91
291.06
Medora South n.1
228
20
8.77
Ray (10 acres
avocados) n.2
690
8
1.16
11.97
Ray (20 acres
citrus) n.2
1,273
124
9.74
194.80
Rockdale
$ 695.89
*274 n.1 See respondent's computation of adjusted basis for Medora South below. n.2 Respondent revised his computation of the unadjusted basis of the Ray grove avocado trees to $ 3,000 and of the Ray grove citrus trees to $ 4,000 in a memorandum reply brief, but did not otherwise recompute his figures pertaining to losses in Ray groves. Respondent computed the adjusted basis for Medora South as of July 1, 1944, as follows, and determined that there was no adjusted basis on September 15, 1945, in the 2 1/2 acres planted with avocado trees which remained in Medora South after the 1944 sale: Acquired - June 21, 1938
Land
Trees
Total
Cost - 35 acres land at $ 75 per acre
$ 2,625.00
Cost - 5 acres avocado trees at $75 per acre for land and $ 275 per acre for trees
$ 1,750.00
$ 4,375.00
Less: Depreciation on $ 1,375 at 1.25% for 6 yrs.
(7-1-38 to 7-1-44)
103.13
Balance on 7-1-44
$ 2,625.00
$ 1,646.87
$ 4,271.87
Sold: (1944) 2 1/2 acres unimproved land and 2 1/2 acres with trees (Basis per income tax return for 1944 of Estate of William J. Krome - $ 2,700) n.1
476.47
2,223.53
2,700.00
Adjusted basis 7-1-44
$ 2,148.53
($ 576.66)
$ 1,571.87
n.1 The $ 2,700 basis claimed on the tax return for the 5 acres sold was allocated between unimproved land and land with trees as follows: Basis claimed
Per cent
per tax return
2 1/2 acres unimproved land at $ 75 per acre
$ 187.50
17.647
$ 476.47
2 1/2 acres with trees at $ 350 per acre
875.00
82.353
2,223.53
$ 1,062.50
100.00%
$ 2,700.00
The grove properties involved in these proceedings, together with their ownership and date of acquisition, and the basis of the trees thereon on September 15, 1945, are as follows: I. B. Krome Grove: This property is located on Avocado Drive, Homestead, Florida, consisting of 6 acres more or less, containing avocado trees and some citrus trees both on May 1, 1930, and on September 15, 1945. The avocados were planted in 1919. The property was owned by petitioner Isabelle B. Krome on September 15, 1945, having been acquired by her by deed dated May 1, 1930, which was given for the cancellation of notes held by Isabelle B. Krome secured by a mortgage dated January 2, 1926. The fair market value of this property on May 1, 1930, was $ 3,000, or $ 400 per acre for the trees and $ 100 per acre for the land, and the basis of the trees on September 15, 1945, was $ 2,400. Fisher Grove: This property is located on Coral Reef Road, Homestead, Florida, halfway between Homestead and Miami, consisting of 10 acres of avocado trees both on July 5, 1938, and on September 15, 1945. The trees were planted in 1923. The property was owned by petitioner William H. Krome on September 15, 1945, having been acquired by him by purchase on July 5, 1938, at a cost of $ 3,500, of which $ 2,750 is allocable to the trees. The grove was in fair condition at that time. The trees could have been improved a lot but the grove was a paying grove. The basis of the trees on September 15, 1945, was $ 275 per acre, or $ 2,750. Krome & Kendall Grove: This property is located at the northwest corner of Coconut Palm Drive and Country Club Road, Homestead, Florida, consisting of 40 acres more or less of avocado trees, lime trees and citrus trees both in November 1940, and on September 15, 1945. A one-half interest in this grove was owned by petitioner William H. Krome on September 15, 1945, having been purchased by him in November 1940. The adjusted basis of the one-half interest of William H. Krome in the trees on September 15, 1945, was $ 2,247.57. Krome 13: This grove is located in Dade County, Florida, in the section known as Rockdale, consisting of 10 acres more or less, and planted with mango trees both on October 2, 1929, and on September 15, 1945. The trees were planted in 1924. This property was owned by the decedent, William J. Krome, on the date of his death, October 2, 1929. It was acquired by the petitioner, estate of William J. Krome, at that time, and was owned by the estate on September 15, 1945. The fair market value of this property on October 2, 1929, was $ 1,500, of which $ 1,000 was allocable to the trees, and the basis of the trees on September 15, 1945, was $ 1,000. Medora North: This grove is located at the northwest corner of Avocado Drive and Krome Avenue, Homestead, Florida, consisting of 40 acres more or less, of which 28 acres were planted with avocado trees both on May 1, 1930, and on September 15, 1945. The trees were planted from 1908 to 1921. It was owned by the estate of William J. Krome on September 15, 1945, having been acquired by the estate by deed dated May 1, 1930, from the Porvenir Co. in consideration of the cancellation of purchase money notes secured by a mortgage dated January 2, 1926, delivered to the decedent, William J. Krome. The fair market value of this property on May 1, 1930, was $ 15,200 (28 acres at $ 500 per acre, 12 acres at $ 100 per acre), of which $ 11,200 (28 acres at $ 400 per acre) was allocable to the trees, and the basis of the trees on September 15, 1945, was $ 11,200. Medora West: This grove is located at the northwest corner of Avocado Drive and Krome Avenue, Homestead, Florida, consisting of 24 acres more or less and planted with avocado trees both on May 1, 1930, and on September 15, 1945. The trees were planted from 1911 to 1924. The property was owned by the estate of William J. Krome on September 15, 1945, having been acquired by the estate by deed dated May 1, 1930, from the Porvenir Co. in consideration of the cancellation of purchase money notes secured by a mortgage dated January 2, 1926, delivered to the decedent, William J. Krome. The fair market value of this property on May 1, 1930, was $ 12,000, or $ 400 per acre for the trees and $ 100 per acre for the land, and the basis of the trees on September 15, 1945, was $ 9,600. Medora South: This grove is located on Avocado Drive, Homestead, Florida. It was owned by the petitioner, estate of William J. Krome, on September 15, 1945, having been acquired by the estate through the foreclosure of a mortgage on this property held by the executrix, Isabelle B. Krome. The foreclosure deed was dated June 21, 1938. At the time of the foreclosure the property consisted of 40 acres, of which 5 acres was planted with avocado trees. The trees were planted in 1913. The executrix sold one parcel of this tract in 1944 containing 5 acres for a consideration of $ 4,000. One-half of the 5-acre parcel sold was planted with avocado trees. Approximately 2 1/2 acres in the part of the grove retained was similarly planted with avocado trees both on June 21, 1938, and on September 15, 1945. The fair market value of these 2 1/2 acres of avocados on June 21, 1938, was $ 1,375, or $ 150 per acre for the land and $ 400 per acre for the trees, and the basis of the trees on September 15, 1945, was $ 1,000. Ray Groves: This property is located on Biscayne Drive, Homestead, Florida, and consists of 40 acres more or less. It was owned by the estate of William J. Krome on September 15, 1945. Both at the time of the death of the decedent, William J. Krome, October 2, 1929, and on September 15, 1945, the Ray Groves consisted of 40 acres of which 10 acres were planted with avocado trees, 10 acres were unimproved and 20 acres were planted with citrus trees. The avocado trees were planted in 1916 and 1924 and the citrus trees were planted in 1924. On the date of his death William J. Krome owned a one-half interest in the 10 acres of avocado trees and the 10 unimproved acres. On the William J. Krome estate tax return this one-half interest in the 10 acres of avocado trees and the 10 unimproved acres was valued at $ 2,125 as of October 2, 1929. The fair market value of this one-half interest on October 2, 1929, was $ 2,125, of which $ 1,125 was allocable to the trees. On the date of his death William J. Krome also had a one-half interest in a mortgage on the 20 acres planted with citrus trees. The other one-half interest in the 10 acres of avocado trees and 10 unimproved acres and the other one-half interest in the mortgage on the 20 acres of citrus trees were owned by one C. E. Schaff. On January 13, 1930, the maker of the mortgage deeded the 20 acres of citrus trees to the executrix of the estate of William J. Krome and to C. E. Schaff. The fair market value of the one-half interest in the citrus acreage in Ray Groves acquired by the estate of William J. Krome on January 13, 1930, was $ 3,000, of which $ 2,000 was allocable to the trees. In September 1930, the executrix of the estate of William J. Krome acquired Schaff's one-half interest in the Ray Groves in a nontaxable exchange in which a one-half interest in a different grove consisting of 40 acres of citrus and known as the Valdan property, which was also owned jointly by the estate of William J. Krome and the said Schaff, was transferred to the said Schaff. The executrix of the estate of William J. Krome and C. E. Schaff had acquired the Valdan property by deed of a Special Master in Chancery, dated January 22, 1930, pursuant to proceedings instituted to foreclose a mortgage executed by B. W. Morris. On the estate tax return of William J. Krome, the B. W. Morris notes, which were secured by the mortgage on the Valdan property referred to above, were disclosed as follows: "Mortgage notes 90,000.00 face, B. W. Morris to W. J. Krome, secured by 40 acres Sec. 1-57-38 - 8% int. none rc'd. since 2-14-26. 1/2 value land $ 6,000.00" The fair market value of the one-half interest in the Valdan property acquired by the estate of William J. Krome on January 22, 1930, on that date was $ 6,000. The basis of the estate of William J. Krome in this one-half interest in the Valdan property transferred in September 1930, in exchange for a one-half interest in Ray Groves was $ 6,000. The basis of the one-half interest in Ray Groves thus acquired was $ 6,000 on September 15, 1945, of which $ 4,000 was allocable to the trees. The basis of the estate of William J. Krome in the 40 acres of Ray Groves on September 15, 1945, was $ 11,000, computed as follows: Basis
1/2 interest 10 A. avocado and 10 A. unimproved owned by W. J. Krome at death
October 2, 1929
$ 2,125
1/2 interest 20 A. citrus acquired by
mortgage foreclosure Jan. 13, 1930
3,000
1/2 interest 10 A. avocado, 10 A. unimproved, 20 A. citrus acquired September
1930, in exchange for 1/2 interest in
Valdan grove - basis in Valdan grove
6,000
Total Basis
$ 11,125
The estate's $ 11,125 basis is allocable between land and trees as follows: Allocation: 40 acres land at $ 100 per acre
$ 4,000
Trees
7,125
Total basis September 15, 1945
$ 11,125 Rockdale Groves: These groves are located on Coral Reef Road, Homestead, Florida, consisting of 20 acres more or less, and planted primarily with avocado trees both on November 22, 1936, and at the time of the hurricane. The trees were planted in 1921 and 1923. During the years 1943, 1944 and 1945, the record title to the Rockdale Groves was vested in the Rockdale Co., a Florida corporation which was dissolved on November 22, 1936, by the State of Florida for failure to pay the capital stock tax. Throughout the year 1945, the year of the hurricane loss, the Rockdale Co. had 240 shares of common stock outstanding which were owned as follows: Isabelle B. Krome
36 shares
William H. Krome
74 shares
Estate of William J. Krome
130 shares
Total
240 shares During 1943, 1944 and 1945 the directors of the Rockdale Co. were Isabelle B. Krome, William H. Krome and E. A. Delicate. The Rockdale Co. filed corporate income tax returns up to 1940, but after that year the Rockdale Co. held no further meetings, made no further annual reports, filed no corporate returns and did no business as a corporation, and the income from the Rockdale Groves was reported by the three petitioners on their individual income tax returns in the following proportions: I. B. Krome, 36/240ths, W. H. Krome, 74/240ths, estate of W. J. Krome, 130/240ths. For the year 1945 a partnership information return was filed under the caption "Rockdale Groves," and this return discloses that an alleged net loss for that year was allocated between the members of the partnership in the following ratio: Isabelle B. Krome
36/240ths
William H. Krome
74/240ths
Estate of W. J. Krome
130/240ths
Rockdale Groves was not owned by petitioners on September 15, 1945. Petitioners incurred losses on their grove properties from a hurricane on September 15, 1945, as follows: ISABELLE B. KROME
Basis (trees)
Per Cent
Deductible
Property
Sept. 15, 1945
of Loss
Loss
I. B. Krome (Grove)
$ 2,400.00
53
$ 1,272.00
Total
$ 1,272.00
WILLIAM H. KROME
Fisher
$ 2,750.00
60.6
$ 1,666.50
Krome & Kendall
2,247.57
62.1
1,395.74
Total
$ 3,062.24
ESTATE OF WILLIAM J. KROME
Krome 13
$ 1,000.00
60.5
$ 605.00
Medora North
11,200.00
64.7
7,246.40
Medora West
9,600.00
51.1
4,905.60
Medora South
1,000.00
53.3
533.00
Ray Groves
7,125.00
68.7
4,894.88
Total
$ 18,184.88
Opinion Petitioners claim losses in 1945 to certain fruit groves near Homestead, Florida, from a hurricane on September 15, 1945, under section 23 (e) (1) and section 23 (i), Internal Revenue Code. [1] Respondent has disallowed a portion of such claimed losses. Petitioner Isabelle B. Krome claims a loss in 1945 to certain shade trees near Homestead, Florida, not connected with the trade or business, from the same hurricane, under section 23 (e) (3) of the code. [1] Respondent has disallowed this claimed loss in its entirety. Petitioners William H. Krome and the estate of William J. Krome claim losses in 1943 from net operating loss carry-backs from 1945 to 1943 under section 23 (s)[2] and section 122 (a) and (b) (1)[3] of the code. Respondent maintains that these petitioners sustained no net operating losses in 1945 and thus have no losses to carry back to 1943. However, respondent concedes that if this Court should determine that these petitioners sustained deductible losses from the 1945 storm in an amount sufficient to cause their grove operations to reflect net losses for that year, then these petitioners would be entitled under sections 23 (s) and 122 (a) and (b) (1) to carry back net loss deductions in 1943. *275 *276 Dealing with these three main issues in reverse order, first, we hold that since the third issue, of whether the petitioners William H. Krome and estate of William J. Krome are entitled to net operating loss carry-backs from 1945 to 1943, is, in view of respondent's concession, entirely matter of computation depending upon our disposition of the first issue, that third issue and the related question of whether respondent properly determined deficiencies against petitioners William H. Krome and estate of William J. Krome for 1943 must be decided under Rule 50. Secondly, we have made a finding that petitioner Isabelle B. Krome is entitled to no deductible loss for alleged casualty loss to shade trees from the hurricane of September 15, 1945, for the reason that petitioner has failed to establish a basis for measuring the alleged loss. As a general rule the amount of deduction claimed under section 23 (e) (3) on account of damage by storm or other casualty to ornamental trees is measured by the difference between the fair market value of the estate immediately before and immediately after the casualty. Whipple v. United States, 25 Fed. (2d) 520; Frederick H. Nash, 22 B.T.A. 482; *277 John S. Hall et al., Executors, 16 B.T.A. 71; Mary Cheney Davis, 16 B.T.A. 65. The deduction, however, may not exceed the taxpayer's adjusted basis in the estate. Helvering v. Owens, 305 U.S. 468. Moreover, in measuring the loss the trees must be treated as an integral part of the realty upon which they were planted. See Harry Johnston Grant, 30 B.T.A. 1028; G.C.M. 21013, 1939-1, C.B. 101. Petitioners state on brief that the shade trees are a part of the property referred to in our findings as the I. B. Krome grove. But there is no evidence to support this statement beyond the fact that the shade trees are described on the return for 1945 of Isabelle B. Krome as being located on Avocado Drive, Homestead, where the I. B. Krome grove is also located. The sole testimony as to the location of the shade trees is that of William H. Krome, as follows: "Q. Will you identify for the record the trees that are referred to as the I. B. Krome shade trees? "A. Those are the trees on the grounds surrounding my mother's house at Homestead." If the shade trees and house are on some other piece of property than the I. B. Krome *278 grove, then under the decisions cited above the claimed casualty loss must be disallowed for lack of substantiation, since there is no evidence as to the fair market value of that other piece of property either before or after the 1945 hurricane. Even if we grant what has not been proved, that the shade trees and house are on the I. B. Krome grove, the claimed casualty loss must still be disallowed for lack of substantiation, since there is no evidence as to the cost, adjusted basis, or fair market value of the house either before or after the 1945 hurricane, but only as to the fair market value of the land and trees. Under the decisions cited above the loss in value of the whole property must be shown to support a casualty loss deduction on damage to ornamental trees about a residence. Thirdly, we have made findings on the amounts of loss sustained in 1945 by petitioners from hurricane damage to their fruit groves. Petitioners and respondent differ fundamentally on two questions necessary to decide this issue, first, the percentage of loss to each grove and, secondly, the basis of each grove on September 15, 1945, the date of the hurricane. We have made findings on these questions. *279 Petitioners have computed the percentage of loss to each grove by a formula which we have found to be reasonable and accurate. In this formula the various costs which go into the total cost of a producing tree are set forth and then it is estimated which of these components still remain after the hurricane. For instance, where a tree has been uprooted, only the tree itself remains. The remaining items which went into the value of the tree, such as cost of planting and of caretaking for several years, are considered wiped out by the hurricane, since they will all have to be repeated before the tree can be a producing tree again. Accordingly, under this method of computation, such a tree is considered to have lost 77 per cent of its value. The weighted average of the percentage of loss for the trees in each grove is taken as the percentage of loss to be applied to the basis of each grove, and the loss for each grove is thus computed. It should be emphasized that the formula itself is used to determine the percentage of the destroyed portion to the entire property and has no relation to the dollar amount of the loss. The formula, used by petitioners and approved by us as reasonable *280 and accurate under the circumstances shown of record, is as follows: "The cost of a tree is represented by: (1) The cost of the tree from the nursery. (2) The cost of planting. (3) The cost of caring for the tree for a period of four years, this being the length of time required for the tree to start bearing crops large enough to meet expenses. (In the case of mangoes, the time is longer and a five-year period instead of a four-year period is used)." "The average cost of a tree as determined from the Krome grove records is made up as follows: % of
Total
Cost
(1) Cost of the tree from the nurs-
ery
$ 1.25
23. (2) Cost of planting
1.00
18.5
(3) Cost of caretaking, first year 2 *
1.00
18.5
(4) Cost of caretaking, second year
.75
13. (5) Cost of caretaking, third year
.75
13.5
(6) Cost of caretaking, fourth year
.75
13.5
Total
5.50
100. * The cost of caretaking includes the cost of watering, fertilizing, hoeing and mowing; the cost decreases after the first year since the costs of the latter years do not include the cost of first-year watering. "In estimating the percentage of damage to a tree, the trees have *281 been grouped in the following classes: (1) Trees entirely destroyed. The damage is 100%. (2) Trees uprooted. In this case the damage is 77% (4.25-5.50) since all that remains is the tree itself. The tree has to be cut back to stumps and re-planted and it will require another four years of caretaking before the tree is again a profitable bearing tree. (3) Trees not uprooted, but which will require caretaking for four years before they are profitable bearing trees again. The percentage of damage is 58% which represents the percentage of the cost of caretaking for four years to the total cost. (4) Trees not uprooted, but which will require caretaking for three years before they are profitable bearing trees again. The percentage of damage is 40%, determined by the same method. (5) Trees which will require two years caretaking. The percentage of damage is 27%. (6) Trees which will require one year caretaking. The percentage of damage is 13 1/2 %." Petitioners then computed, by means of the above formula, the percentage of loss for each grove, as follows, which percentages of loss we have followed in our own findings of loss on all petitioners' fruit groves except the Rockdale *282 Groves (which we have found that petitioners did not own on September 15, 1945): I. B. KROME GROVE
Number of Trees
% of
Number of
Times %
Description
Damage
Trees
of Damage
Destroyed
100
33
33
Uprooted
77
154
118
Caretaking, 4 yrs.
58
74
43
Caretaking, 3 yrs.
40
73
29
Caretaking, 2 yrs.
27
88
24
Caretaking, 1 yr.
13.5
50
7
No damage
0
8
0
480
254
Percentage of loss: 254/480 = 53.0% FISHER GROVE
Number of Trees
% of
Number of
Times %
Description
Damage
Trees
of Damage
Destroyed
100
50
50
Uprooted
77
404
311
Caretaking, 4 yrs.
58
151
88
Caretaking, 3 yrs.
40
104
42
Caretaking, 2 yrs.
27
94
25
Caretaking, 1 yr.
13.5
62
8
865
524
Percentage of loss: 524/865 = 60.6% KROME AND KENDALL GROVE
Number of Trees
Number of Trees
Times % of Damage
% of
Block
Block
Block
Block
Description
Damage
(1)
(2)
(1)
(2)
Destroyed
100
57
128
57
128
Uprooted
77
769
1,303
592
1,003
Caretaking, 4 yrs.
58
345
85
200
49
Caretaking, 3 yrs.
40
332
35
133
34
Caretaking, 2 yrs.
27
222
106
60
29
Caretaking, 1 yr.
13.5
78
227
11
31
18,803
1,934
1,053
1,274
*283 Percentage of loss: Block (1) - 58.4% Block (2) - 65.9% Average: 62.1% KROME 13
Number of Trees
% of
Number of
Times %
Description
Damage *
Trees
of Damage
Destroyed
100
25
25
Uprooted
66.7
334
223
Caretaking, 5 yrs.
53.4
50
27
Caretaking, 4 yrs.
40
40
16
Caretaking, 3 yrs.
30
28
8
Caretaking, 2 yrs.
20
15
3
Caretaking, 1 yr
10
7
1
499
303
* These percentages vary from those of the other groves because the grove consists of mangoes. The cost of the tree is greater and the number of years of caretaking before production is reached is five instead of four. Percentage of loss: 303/499 = 60.5% MEDORA NORTH AND MEDORA WEST
Number of Trees
Number of Trees
Times % of Damage
% of
Medora
Medora
Medora
Medora
Description
Damage
North
West
North
West
Destroyed
100
278
89
278
89
Uprooted
77
1,200
364
924
280
Caretaking, 4 yrs.
58
302
193
175
112
Caretaking, 3 yrs.
40
306
160
122
64
Caretaking, 2 yrs.
27
257
149
69
40
Caretaking, 1 yr.
13.5
104
259
14
35
2,447
1,214
1,583
620
Percentage of loss: *284 Medora North: 1,583/2,447 = 64.7% Medora West: 620/1,214 = 51.1% MEDORA SOUTH
Number of Trees
% of
Number of
Times %
Description
Damage
Trees
of Damage
Destroyed
100
26
26
Uprooted
77
67
52
Caretaking, 4 yrs.
58
31
18
Caretaking, 3 yrs.
40
29
11
Caretaking, 2 yrs.
27
32
9
Caretaking, 1 yr.
13.5
43
6
228
122
Percentage of loss: 122/228 = 53.3% RAY GROVES
Number of Trees
% of
Number of
Times %
Description
Damage
Trees
of Damage
Destroyed
100
195
195
Uprooted
77
1,231
948
Caretaking, 4 yrs.
58
144
83
Caretaking, 3 yrs.
40
175
70
Caretaking, 2 yrs.
27
166
45
Caretaking, 1 yr.
13.5
52
7
1,963
1,348
Percentage of loss: 1,348/1,963 = 68.7% ROCKDALE GROVES
Number of Trees
Number of Trees
% of
Block
Block
Times % of
Description
Damage
(1)
(2)
Total
Damage
Destroyed
100
55
40
95
95
Uprooted
77
387
278
665
512
Caretaking, 4 yrs.
58
201
218
419
243
Caretaking, 3 yrs.
40
136
130
266
106
Caretaking, 2 yrs.
27
69
97
166
45
Caretaking, 1 yr.
13.5
23
73
96
13
871
836
1,707
1,014
*285 Percentage of loss: 1,014/1,707 = 59.4% Petitioners then applied the above percentages of loss to the bases which they recited for the trees in each grove, and claimed the resulting figures as deductible losses. We have applied the same percentages, except as to the Rockdale Groves, to the bases which we have found for the trees in each grove, and have found losses accordingly. Petitioners rely upon I.T. 3921, 1948-2 C.B. 32[4] and G.C.M. 6122, VIII-2 C.B. 115[5] as authority for their deduction of partial losses to their fruit trees. Respondent, however, has disallowed all such deductions of partial losses and has conceded loss to petitioners' groves only as to the trees that were totally destroyed by the hurricane. It is respondent's position that no deduction should be allowed for trees partially destroyed because, he contends, substantially all the damage to such trees can be classified as "incidental or minor damage or mere retardation of growth," deduction for which is held not allowable under I.T. 3921, supra. *286 We do not agree. If deductions for partial losses to fruit trees are not allowable in the instant case, it is difficult to conceive of a case in which they would be allowable. Here an exceptionally severe hurricane, with winds sometimes reaching 150 miles per hour, passed directly through petitioners' groves, destroying, uprooting and twisting trees and breaking off large limbs, smaller branches, and leaves. At the time of the hearing in April 1949, 3 1/2 years after the hurricane, petitioner William H. Krome testified that petitioners' groves had not yet recovered from the effects of the hurricane, and one of respondent's witnesses, a horticulturist, vice-director of the University of Florida Subtropical Experimental Station in Homestead, testified to the same effect in regard to groves in general in the Homestead area. Another witness for respondent, a horticulturist whose work was largely with citrus, testified that a citrus tree with most of the limbs blown off would take 4 or 5 years to produce again, and that a citrus tree that had been uprooted and reset should produce commercial crops in the third year after the storm but that it would take longer to reach the same production *287 it had prior to the storm. The first of the above witnesses for respondent testified that avocado and mango trees in the Station in Homestead with large limbs blown off showed signs of producing a crop in 1949 for the first time since 1945. Without going into further detail it is obvious that this type of damage is not "incidental or minor damage or mere retardation of growth." Inasmuch as a lime tree will produce commercially after the fourth year and an avocado or mango will pay its way after 7 years, it is clear that when one of these trees has been made nonproductive for a space of several years the owner has suffered a loss hardly less severe than if the tree had been totally destroyed. Respondent also maintains that: "* * * petitioners' method of computing partial loss is subject to further objection because it makes substantially no distinction between trees of the various types and because it treats all damage, no matter how slight, as being permanent to some extent. * * *" However, as we have noted, petitioners did use a different method of computation for the mango from that used for the other trees. Nor is there anything in the record to indicate that there were any *288 substantial differences in the damage to the avocado and citrus trees from the storm or that it would be error to use the same method of computation of damage for all of them. One of respondent's witnesses, a horticulturist, did testify that citrus trees were in general more resistant to wind damage than avocados or mangoes. However, the same witness also stated that the citrus trees which had been uprooted and reset in the ground were liable to be tipped over in subsequent storms. Another horticulturist witness for respondent had made the same statement in regard to the avocado trees. We accordingly hold that petitioners did not err in using the same method of computation for the damage to all trees except the mango. Respondent's concern that petitioners may have claimed deductions for losses which may turn out not to be permanent is not shared here. After all, even the totally destroyed trees, for which respondent is willing to allow deduction, can be replaced. As we have pointed out, though the damaged trees may be brought back to production after several years, in the intervening years the owners have been without them as assets just as much as if the trees had been destroyed. *289 Moreover, witnesses for both petitioners and respondent testified that the trees damaged by the storm would never be as good as they were before the storm. Accordingly, petitioners were entitled to partial losses and we have found that their method of computation of percentages of loss, which we have fully detailed, was a reasonable and accurate one, and we have followed it in our own computations. Respondent further voices objection to the partial losses here claimed because in keeping their books and preparing their income tax returns for the years since 1945 petitioners have treated rehabilitation expenses of the groves since the hurricane as a charge against current income. Hence, according to respondent, in claiming partial losses on the damaged trees, "petitioners are now seeking a double deduction for the rehabilitation expenses." But the years subsequent to 1945 are not here before us. Furthermore, as we have pointed out, the groves have not by any means been rehabilitated completely since 1945, if they ever will be. Moreover, the books and returns for those years were not introduced in evidence and without a scrutiny of the individual items on those returns it would be impossible *290 to say which, if any, of such items actually represented a duplication of items deducted in 1945 as losses, or which, if any, of them merely represented deductible, added business expenses arising from the losses. At any rate, our sole concern here is whether petitioners were entitled to certain loss deductions in 1945, and, under the authority of I.T. 3921, we hold that petitioners were entitled to losses in 1945 on partial damage to their fruit trees in the percentages computed by them. Respondent also disputes the number of trees claimed by petitioners to have been destroyed. Respondent relies on the number as shown in the returns for 1945, which number was based on a survey made January 15-17, 1946. Petitioners, however, made another survey in the summer of 1946 and rely on this survey in their listings of trees destroyed in their amended petitions and on brief. This latter survey was considered accurate by two of petitioners' witnesses who inspected petitioners' groves after the hurricane. There was no testimony in behalf of the earlier survey. We have accordingly followed petitioners and used the figures as to trees destroyed and damaged of the latter survey. Nor do Oregon Mesabi Corp., 39 B.T.A. 1033, *291 cited by respondent, or Nourse v. Birmingham, 73 Fed. Supp. 70, require of us a different conclusion on this point. In the former of these cases timber of the taxpayer was killed by fire in 1933 but it still had some value as timber. Subsequently, it was attacked by insects and fungi and made worthless. It was held that the entire timber was not the subject of a loss deduction in the year of the fire, but that such a deduction was to be taken in the years and amounts in which the destruction and worthlessness occurred. In the latter case, Nourse v. Birmingham, supra, trees which were used as a windbreak were damaged by a blizzard in 1940. However, the utility of the trees as a windbreak was not lost until 1941. Therefore it was held that the loss was deductible in 1941. The court emphasized that the claim filed by the taxpayer for refund was for loss to a windbreak, and not for a loss for the killing of the trees as such. In the instant case, on the other hand, trees that had been killed by the hurricane had no further value as producers of fruit, even though in some cases the death was a lingering one. Thus, it can be said that the trees that died in the *292 next few months after the hurricane had been made worthless by and at the time of the hurricane, not by supervening events, and that the loss was accordingly deductible in 1945. Because of the difficulty of determining, in the chaos in the groves following the hurricane, which trees that were uprooted or defoliated or otherwise injured would live and which would not, some latitude of time for an orderly survey must be allowed. As said in Lucas v. American Code Co., Inc., 280 U.S. 445, "The general requirement that losses be deducted in the year in which they are sustained calls for a practical, not a legal, test." No trees that died after the summer of 1946 have been deducted as losses by petitioners. But as between two surveys of loss made before that time in 1946, we have employed the one which testimony supported, even though later in point of time. As already noted, petitioners and respondent, in addition to their differences on the percentage of loss to each grove, also differ as to the basis of each grove on September 15, 1945, the date of the hurricane. In the first place, respondent maintains that petitioners' avocado groves are subject to depreciation upon the *293 basis of an 80-year life, whereas petitioners have treated the avocado groves as nondepreciable, like the mango groves and the citrus groves (other than the Krome and Kendall lime trees). Respondent does not question this treatment in the case of the mango and citrus groves (other than the Krome and Kendall lime trees), and he does not seek to change the 3 per cent depreciation rate used by the petitioner, William H. Krome, in connection with the Krome and Kendall lime trees. Respondent bases the figure of 80 years as the useful life of an avocado tree upon the following statement by one of his witnesses, a horticulturist who worked with trees in Homestead, Florida, among them avocado, mango and lime trees: "Q. Do you have any opinion yourself as to how long such an avocado tree might be productive for commercial purposes? "A. If it were not for storms, I would say possibly 75 or 80 years." However, this witness admitted on cross-examination that he did not know of his own knowledge whether 75 or 80 years was the actual limit of the bearing age and that he had heard reports of older avocado trees. Petitioner William H. Krome, an experienced grower with a degree in Agriculture, *294 testified that the avocado lived longer than any tree and that he had seen 200-year old avocado trees still producing excellent fruit. Another of petitioners' witnesses, also an experienced grower in Homestead with a degree in Agriculture, testified that he had never yet seen an avocado tree too old to bear. Another of petitioners' witnesses, a real estate broker in the Miami-Homestead area, testified that in evaluating avocado and mango groves for sale purposes, it was not the practice of persons engaged in business in that area to give any consideration to depreciation, for the reason that "the older an avocado gets, the more it produces." Another of petitioners' witnesses, an experienced grower in Homestead, testified that "there is no average life of an avocado tree. The tree will live indefinitely if it isn't affected by a disasterous storm or breeze." Moreover, it was the practice of petitioners to maintain their groves in a state of high productivity and quality by replacing nonproductive trees and top-working other trees to newer and better varieties. Respondent's witness who had given the 80-year figure in the testimony quoted above, agreed that in view of this practice *295 such groves, including avocado groves, did not depreciate in the ordinary sense of the term. Several of the witnesses of petitioners, mentioned above, testified to the same effect. When the age of trees is indeterminate and the trees increase in productivity with age, no depreciation is allowable. Thomas Palmer, 23 B.T.A. 296; Chester B. Knox, 2 B.T.A. 1107. In view of the testimony cited above, we see no reason for holding that the abocado groves should receive a different treatment from that employed by respondent and petitioners for the mango and citrus groves (other than the Krome and Kendall lime trees) and we have accordingly found as a fact that neither the mango, nor the citrus (other than the Krome and Kendall lime trees) nor the avocado trees of petitioners are subject to depreciation. We have further found as a fact that the lime trees of the Krome and Kendall groves are depreciable at the rate of 3 per cent, as agreed by respondent and petitioners. We have made findings as to the ownership of each of the groves for which claimed losses are here in dispute and as to the September 15, 1945, basis of the trees in the groves owned by petitioners, *296 such findings being necessary to compute the amount of these losses, if any, properly deductible. A brief explanation of such findings follows: Krome & Kendall Grove: A one-half interest in this grove was owned by petitioner William H. Krome on September 15, 1945. Petitioners and respondent agree that the adjusted basis of the trees in this one-half interest on September 15, 1945, was $ 2,247.57 and we have made finding accordingly. Krome 13 Grove: This grove was owned by the petitioner, estate of William J. Krome, on September 15, 1945. It was acquired by the estate from the decedent, William J. Krome, at the time of the latter's death on October 2, 1929. Under section 113(a) (5) of the code, the estate's basis in this property on September 15, 1945, is its fair market value on October 2, 1929. On the estate tax return filed by the estate of William J. Krome the Krome 13 Grove was valued for estate tax purposes at $ 1,500, or $ 150 per acre. Respondent relies on this figure, allocating $ 50 per acre to the land. It is settled that a value reported and accepted for estate tax purposes is not necessarily conclusive in a later controversy over basis. Stella H. McConnell, 29 B.T.A. 32. *297 However, the representation for estate tax purposes bears a presumption of correctness, which can only be overcome by convincing evidence of another value. Northport Shores, Inc., 31 B.T.A. 1013; Anson Evans et al., Trustees, 29 B.T.A. 710; Stella H. McConnell, supra.Petitioners assert that the fair market value of this grove on October 2, 1929, was $ 5,000, or $ 500 per acre, of which $ 450 per acre was allocable to the trees. Their sole support for this assertion was the testimony of one of their witnesses, a grower and former Federal Land Bank appraiser, who stated that avocado groves in the Homestead area were worth about $ 500 per acre in 1929 and 1930, and that this valuation applied to the Krome 13 Grove. However, this witness was unable to cite any actual sales at that figure. He also stated that in his opinion the land in Krome 13 was worth $ 50 an acre in 1929. On consideration of all the evidence and testimony, we have found that the fair market value of this property on October 2, 1929, was $ 1,500, of which $ 1,000 was allocable to the trees, and that the basis of the trees on September 15, 1945, was $ 1,000. Fisher Grove: This grove *298 was owned by the petitioner William H. Krome on September 15, 1945. He purchased it on July 5, 1938, for $ 3,500 and its basis on September 15, 1945, was therefore this cost price. Petitioners contend that only $ 50 per acre of the cost is allocable to the land alone, while respondent contends that $ 75 per acre should be allocated to the land. W. H. Krome, the petitioner, testified that the $ 3,500 purchase price was set up on his books at $ 300 per acre for the trees and $ 50 per acre for the land. However, another of petitioners' witnesses, a real estate broker in the Miami-Homestead area, testified that in his opinion the land was worth $ 75 in 1938. On consideration of all the evidence and testimony, we have found that the basis of the trees on this property on September 15, 1945, was $ 275 per acre, or $ 2,750. Medora South: This grove was owned by the petitioner, estate of William J. Krome, on September 15, 1945. It was acquired through the foreclosure of a mortgage on June 21, 1938. The basis of property acquired by mortgage foreclosure is fair market value upon the date of foreclosure. Regulations 111, section 29.23(k)-3; Bennett v. Commissioner (C.C.A., 8th Cir., 1944), 139 Fed. (2d) 961; *299 Hadley Falls Trust Co. v. United States (C.C.A., 1st Cir., 1940), 110 Fed. (2d) 887. Petitioners contend that the property's fair market value on June 21, 1938, was $ 200 per acre for the land and $ 500 per acre for the trees, relying upon the opinion expressed by one of their witnesses, a grower and former Federal Land Bank appraiser. He did not cite any sales of comparable property at these figures. He gave as the reason for the $ 200 valuation he placed upon the land the fact that this grove was within the city limits of Homestead. On July 5, 1938, the petitioner William H. Krome purchased the Fisher grove, also an avocado grove, in the Homestead area but halfway to Miami, for $ 350 an acre. This grove was in fair condition at the time. Respondent, relying on the price paid for the Fisher grove, contends that the fair market value of Medora South on June 21, 1938, was $ 75 an acre for the land and $ 275 an acre for the trees. When acquired, Medora South contained 40 acres of which 5 acres were planted with avocado trees and the remaining 35 acres were unimproved. In 1944 the estate sold a 5-acre tract from the grove for $ 4,000, the acreage sold consisting of 2 1/2 acres *300 planted with avocados and 2 1/2 unimproved acres. Thus, in 1945 the grove contained 35 acres of which 2 1/2 acres were planted with avocado trees. In its 1944 income tax return the estate of William J. Krome claimed a basis of $ 2,700 for the 5 acres sold. Respondent, using a computation which we have set forth in our findings, urges that the estate of William J. Krome had no adjusted basis in the 2 1/2 acres planted with avocado trees which remained in Medora South after the 1944 sale. His method is to compute the cost of the 5 acres of avocados on June 21, 1938, by means of the figures for which he here contends - $ 75 per acre for land and $ 275 for trees. From this so-called cost of $ 1,750 he deducts depreciation of $ 103.13 to arrive at an adjusted basis for the 5 acres on July 1, 1944, of $ 1,646.87. He then takes the figure of $ 2,700, the basis which the estate of William J. Krome claimed for the 2 1/2 acres of unimproved land and 2 1/2 acres with trees which it sold on July 1, 1944, computes the basis of the 2 1/2 acres of trees at $ 2,223.53, and subtracts $ 2,223.53 from $ 1,646.87 to arrive at a minus adjusted basis for the 2 1/2 acres of avocados which remained in Medora South *301 after the 1944 sale, and therefore no adjusted basis on the date of the hurricane. This computation is founded on two assumptions with which we do not agree and therefore we have disregarded it in our finding of the basis of the 2 1/2 acres of avocado trees in Medora South on September 15, 1945. In the first place, respondent assumes that the fair market value of Medora South on June 21, 1938, was $ 75 per acre for land and $ 275 per acre for trees, which we have not found. In the second place respondent computes the basis of the acres remaining in Dedora South after a sale of part of the acreage by subtracting from the alleged basis of the whole grove the basis claimed on the estate's income tax return for 1944 for the portion sold. We see no justification for this method. Whether or not the basis of the portion sold in 1944 was correctly computed on the estate's income tax return for 1944 is a question which is not here before us. In any case, we are not bound by that figure in our computation of the basis of the portion not sold. See John B. Hollister, 44 B.T.A. 851. On consideration of all the evidence and testimony, we have found that the fair market value of *302 2 1/2 acres of avocados in Medora South on June 21, 1938, was $ 1,375, or $ 150 per acre for the land and $ 400 per acre for the trees, and that the basis of the trees on September 15, 1945, was $ 1,000. Ray Groves: This property was owned by the petitioner, estate of William J. Krome, on September 15, 1945. There were 40 acres in this grove of which 20 acres were planted with citrus trees, 10 acres with avocado trees, and 10 acres were unimproved. The estate acquired a one-half interest in the 10 acres of avocados and the 10 unimproved acres from the decedent, William J. Krome, at the time of his death on October 2, 1929. Under section 113 (a) (5), of the code, the estate's basis in this interest on September 15, 1945, was one-half of the fair market value of the property on October 2, 1929. On the William J. Krome estate tax return this one-half interest in the 10 acres of avocados and the 10 unimproved acres was valued at $ 2,125 as of October 2, 1929. Respondent contends that $ 2,000 represents the fair market value as of that date. As was pointed out, with accompanying citations, in our discussion of the basis of Krome 13 Grove, a value reported and accepted for estate tax purposes *303 if not necessarily conclusive in a later controversy over basis, but it bears a presumption of correctness. Petitioners assert that the fair market value of this one-half interest in the avocado acreage in Ray Groves on October2, 1929, was $ 500 per acre (for land and trees), and that the trees had a fair market value of $ 400 per acre. They rely for these figures upon the testimony of one of their witnesses, a grower and former Federal Land Bank appraiser, who stated as noted in our discussion of Krome 13 Grove, that avocado groves in the Homestead area were worth about $ 500 per acre in 1929 and 1930, though he cited no sales at this figure, that this valuation applied to the portion of Ray Groves planted with avocados, and that the trees in the latter were worth $ 400 per acre, the land $ 100 per acre in 1929 and 1930. On consideration of all the evidence and the testimony, we have found that the fair market value of the one-half interest in 10 acres of avocados and 10 unimproved acres in Ray Groves acquired by the estate on October 2, 1929, was $ 2,125 as of that date, of which $ 1,125 was allocable to the trees, and that the basis of the trees in this interest on September 15, 1945, was *304 $ 1,125. The estate of William J. Krome acquired a one-half interest in the 20 acres of citrus in Ray Groves on January 13, 1930, in return for a cancellation of a mortgage on the property. Hence, the estate's basis in this interest is one-half of the property's fair market value on January 13, 1930. Gould Securities Co., Inc. v. United States (C.C.A., 2nd Cir., 1938), 96 Fed. (2d) 780; The First National Bank, Philipsburg, Pa., 43 B.T.A. 456. Petitioners contend that the fair market value of this one-half interest on that date was $ 4,000, of which $ 3,000 was allocable to the trees and $ 1,000 to the land. Respondent contends that the fair market value of this one-half interest on that date was $ 3,000, or $ 300 per acre, with $ 100 per acre allocable to the land. The Valdan Grove, also a citrus grove in this area, had been given a value of $ 300 per acre (for land and trees) as of October 2, 1929, on the estate tax return of the estate of William J. Krome. Moreover, a witness for petitioners, a grower and former Federal Land Bank appraiser, stated that the citrus acreage in Ray Groves in January 1930 was worth $ 300 per acre. On consideration of all the evidence *305 and the testimony we have found that the fair market value of the one-half interest in the citrus acreage in Ray Groves acquired by the estate of William J. Krome on January 13, 1930, was $ 3,000, of which $ 2,000 was allocable to the trees, and that the basis of this one-half interest in the trees on September 15, 1945, was $ 2,000. The estate of William J. Krome obtained the final one-half interest in the Ray Groves in September 1930, through a nontaxable exchange for a one-half interest in the Valdan Grove (40 acres of citrus). The estate's basis in the final one-half interest in the Ray Groves is therefore the same as its basis in the one-half interest in the Valdan Grove. Section 112 (b) (1); section 113 (a) (6), Internal Revenue Code. The estate of William J. Krome had acquired the one-half interest in the Valdan Grove through foreclosure of a mortgage on January 22, 1930. The basis of property acquired by mortgage foreclosure is fair market value upon the date of foreclosure. Regulations 111, section 29.23 (k)-3; Bennett v. Commissioner, supra; Hadley Falls Trust Co. v. United States, supra.Petitioners contend for a valuation *306 of $ 8,000 for this one-half interest in the Valdan Grove on this date. However, on the estate tax return filed for William J. Krome his interest in the notes secured by the Valdan Grove mortgage was listed at a value of $ 6,000, and the return recites that this valuation represented one-half the value of the mortgaged property. Moreover, a witness for petitioners, a grower and former Federal Land Bank appraiser, stated that the Valdan Grove had a value of $ 300 per acre in 1930. On consideration of all the evidence and testimony, we have found that the basis of the final one-half interest in the Ray Groves acquired by the estate in September 1930, was $ 6,000, of which $ 4,000 was allocable to the trees and that the basis of this interest in the trees on September 15, 1945, was $ 4,000 On consideration of all the evidence and testimony, we have found that the basis of the estate of William J. Krome in Ray Groves on September 15, 1945, was $ 11,125, of which $ 4,000 was allocable to the land and $ 7,125 to the trees. I. B. Krome Grove; Medora North; Medora West: The I. B. Krome Grove was owned by the petitioner Isabelle B. Krome on September 15, 1945. Medora North and Medora West were *307 owned by the petitioner, estate of William J. Krome, on September 15, 1945. These groves were obtained by the respective owners on May 1, 1930, in return for the cancellation of notes held by them secured by mortgages. Hence petitioner's basis in these groves on September 15, 1945, is their fair market value on May 1, 1930. Gould Securities Co., Inc. v. United States, supra; The First National Bank, Philipsburg, Pa., supra. Petitioners assert that the fair market value of these groves on May 1, 1930, exclusive of any shade trees on the I. B. Krome Grove, was $ 500 per acre for the avocado acreage, of which $ 400 per acre was allocable to the trees, and $ 100 per acre to the land. They rely upon the testimony of one of their witnesses, a grower and former Federal Land Bank appraiser, who stated, as noted in our discussion of Krome 13 Grove, that avocado groves in the Homestead area were worth about $ 500 per acre in 1929 and 1930, though he cited no sales at this figure, and that this valuation applied to, among others, the I. B. Krome Grove, Medora North, and Medora West. He also stated that in his opinion the trees in these groves were worth $ 400 per acre, *308 the land $ 100 per acre in 1929 and 1930. Respondent, on the other hand, maintains that the fair market value of these groves on May 1, 1930, was $ 400 per acre for the avocado acreage, of which he allocates $ 300 per acre to the trees, and $ 100 per acre to the land. He maintains that these groves were similar in character and condition to Krome 13 and the avocado acreage of Ray Groves, which were reported for estate tax purposes by the estate of William J. Krome at approximately $ 150 per acre and $ 300 per acre. Though no sales of avocado acreage in 1930 in the Homestead area were cited by petitioners' witness to support the figures urged by them, there was in September 1930, four months after May 1, 1930, as we have set forth in our discussion of the Ray Groves, a nontaxable exchange in which a one-half interest in the 10 acres of avocado trees, the 20 acres of citrus, and the 10 unimproved acres in the Ray Groves was exchanged for property (the Valdan Groves) which we have found to have had a basis of $ 6,000 in September 1930. Assuming, as stated by petitioners' witness and as agreed to by respondent, that the land in this area had a value in 1930 of $ 100 per acre and the citrus acreage *309 a value in 1930 of $ 300 per acre (for land and trees), then the price of the one-half interest in the avocado acreage of Ray Groves acquired in September 1930 may be computed as follows: 10 acres of land at $ 100 per acre
$ 1,000 X 1/2 = $ 500
20 acres of citrus (land and trees) at $ 300 per acre
6,000 X 1/2 = 3,000
10 acres of avocados (land and trees) at $ 500 per acre
5,000 X 1/2 = 2,500
$ 12,000 X 1/2 = $ 6,000
On consideration of all the evidence and testimony, we have found that the fair market value of the I. B. Krome Grove on May 1, 1930, was $ 3,000, or $ 400 per acre for the trees and $ 100 per acre for the land, and that the basis of the trees on September 15, 1945, was $ 2,400. We have further found that the fair market value of Medora North on May 1, 1930, was $ 15,200 (28 acres at $ 500 per acre, 12 acres at $ 100 per acre), of which $ 11,200 (28 acres at $ 400 per acre) was allocable to the trees, and that the basis of the trees on September 15, 1945, was $ 11,200. We have further found that the fair market value of Medora West on May 1, 1930, was $ 12,000, or $ 400 per acre for the trees and $ 100 per acre for the land, and that the basis of the trees *310 on September 15, 1945, was $ 9,600. Rockdale Groves: Petitioners contend that they held in June 1940 and on September 15, 1945, the following interests in Rockdale Groves: Isabelle B. Krome
36/240
William H. Krome
74/240
Estate of William J. Krome
130/240 They assert that Rockdale Groves was distributed in liquidation by the Rockdale Co., a corporation, to themselves as stockholders in proportion to their stockholdings. They claim losses in those proportions in 1945 from hurricane damage to Rockdale Groves. Respondent, however, maintains that petitioners did not own Rockdale Groves on September 15, 1945, and therefore are entitled to no deductible losses on this property in 1945. It has been stipulated that during 1945 the record title to the Rockdale Groves was vested in the Rockdale Co., a Florida corporation, which was dissolved on November 22, 1936, by the State of Florida for failure to pay the capital stock tax. It has also been stipulated that during 1945 the Rockdale Co. had 240 shares of common stock outstanding which were owned as follows: Isabelle B. Krome
36 shares
William H. Krome
74 shares
Estate of William J. Krome
130 shares
*311 It is thus plain that Rockdale Groves, an asset of the corporation, had not been formally distributed to the stockholders nor their shares surrendered in exchange therefor prior to the end of 1945. Under the law of Florida the directors of a corporation dissolved for failure to pay its capital stock tax become trustees of any property owned by the corporation, and they are required to handle and dispose of such property for the benefit of the corporate stockholders. Florida Statutes (1941), section 610.18. Petitioners argue that they, petitioners, were thus under statute the owners of Rockdale Groves both in law and equity, and they imply that therefore no formal transfer of the property was necessary. We do not agree. It is true that under the statute above cited the stockholders, petitioners, became the beneficial owners of the corporate property after dissolution. It is also true that two of the three stockholders here were two of the three directors and that the latter, under the statute, became trustees of the corporate property after dissolution. But, as said in Mrs. Grant Smith, 26 B.T.A. 1178, 1184: "It is well established that the mere dissolution of a *312 corporation does not effect a distribution of its assets among its stockholders, and furthermore that such a distribution is not effected by the turning over of the assets of the corporation to trustees in liquidation who may also be stockholders of the corporation." Cf. Kirby v. Commissioner (C.C.A., 5th Cir., 1939), 102 Fed. (2d) 115; Taylor Oil & Gas Co. v. Commissioner (C.C.A., 5th Cir., 1931), 47 Fed. (2d) 108. Nor does the fact that the Rockdale Co. ceased to do business as a corporation or file corporate returns after 1940, or that the petitioners operated Rockdale Groves and reported the income from it on their individual returns after 1940 and on a partnership return in 1945, require of us a different conclusion. Florida law provides that the aforesaid trustees have: "* * * full power and authority at any time within twenty years from the date of such dissolution to sell, convey, assign, release, subordinate and satisfy any right, title, interest, claim, lien or demand in, to or upon any real property standing of record in this state in the name of such dissolved corporation." [Florida Statutes (1941), section 610.37.] No such conveyance *313 of Rockdale Groves was ever made by the trustees in the name of the corporation to the stockholders herein. In the face of this failure to carry out explicit statutory provisions for the manner of transferring corporate property after dissolution, we can not, on the facts here before us, ignore title of record in the name of the corporation and the separate entities of corporation and stockholders, and we must hold that ownership of the property remained in the corporation. Cf. New Colonial Ice Co., Inc. v. Helvering, 292 U.S. 435. Accordingly, if damage was suffered by that property as a result of the hurricane, it reduced the value of an asset of the corporation, but the stockholders realized no loss in 1945 from such damage, either in fact or in law. We have therefore found that petitioners are entitled to no deductible losses in 1945 from alleged damage to Rockdale Groves resulting from a hurricane on September 15, 1945. We hold that petitioners are entitled to deductible losses in 1945 from hurricane damage to their fruit groves in the following amounts: Isabelle B. Krome
$ 1,272.00
William H. Krome
3,062.24
Estate of William J. Krome
18,184.88
*314 Decisions will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - (1) if incurred in trade or business; or * * *
(3) of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty, or from theft. No loss shall be allowed as a deduction under this paragraph if at the time of the filing of the return such loss has been claimed as a deduction for estate tax purposes in the estate tax return. * * *
(i) Basis for Determining Loss. - The basis for determining the amount of deduction for losses sustained, to be allowed under subsection (e) or (f), and for bad debts, to be allowed under subsection (k), shall be the adjusted basis provided in section 113 (b)↩ for determining the loss from the sale or other disposition of property. 2. SEC. 23. * * *
(s) Net Operating Loss Deduction. - For any taxable year beginning after December 31, 1939, the net operating loss deduction computed under section 122↩. 3. SEC. 122. NET OPERATING LOSS DEDUCTION. (a) Definition of Net Operating Loss. - As used in this section, the term "net operating loss" means the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d). (b) Amount of Carry-Back and Carry-Over. - (1) Net Operating Loss Carry-Back. - If for any taxable year beginning after December 31, 1941, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-back for each of the two preceding taxable years, except that the carry-back in the case of the first preceding taxable year shall be the excess, if any, of the amount of such net operating loss over the net income for the second preceding taxable year computed (A) with the exceptions, additions, and limitations provided in subsection (d) (1), (2), (4), and (6), and (B) by determining the net operating loss deduction for such second preceding taxable year without regard to such net operating loss.↩
4. I.T. 3921: In view of the foregoing, it is held that an actual physical loss with respect to trees used in the taxpayer's trade or business, which trees are partially destroyed by freeze, hurricane, or other casualty, is deductible for Federal income tax purposes under section 23 (e) (1) or (f) of the Internal Revenue Code↩ where the loss does not consist of incidental or minor damage or mere retardation of growth and where satisfactory proof of loss is furnished. O.D. 374, supra, is hereby modified. The basis to be used in determining the amount of loss sustained is the adjusted basis of the property for determining gain or loss, and the amount of any loss allowed will reduce the basis for depreciation. 5. G.C.M. 6122: It is contended that the amount of the loss is the difference between the depreciated cost or March 1, 1913, value of the building, as the case may be, and the salvage value of the property after the storm. This is the proper rule only when damaged property is to be discarded or junked. Otherwise, the rule is that the deductible loss is the same percentage of the depreciated cost or March 1, 1913, value, as the case may be, which the destroyed portion is of the entire property. If any portion of the building is continued in use, though damaged, a proportionate deduction may be taken. (A.R.R. 4725↩, C.B. III-1, 143.)