**ESTATE OF Clyde L. RINALDI, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 95 493 T.**

United States Court of Federal Claims.

July 11, 1997.

As Modified July 14, 1997.

---

George W. Ericksen, Tampa, FL, for plaintiff.

Elizabeth D. DePriest, with whom were Loretta C. Argrett, Assistant Attorney General, Mildred L. Seidman, Chief, Court of Federal Claims Section, and Steven I. Frahm, Senior Trial Attorney, Department of Justice, Washington, DC, for defendant.

## OPINION

WIESE, Judge.

### Introduction

Plaintiff, the estate of Clyde L. Rinaldi, seeks a refund of taxes assessed against it by the Internal Revenue Service stemming from the agency's disallowance of certain deductions claimed by plaintiff as part of its estate tax return. The two issues subject to the parties' cross-motions for summary judgment presently before the court are: the validity of the estate's election of a marital trust as qualified terminable interest property ("QTIP") under Internal Revenue Code § 2056(b)(7); and the amount properly deductible as a casualty, under § 2054, for the freeze loss of citrus groves owned by plaintiff.[1] The court will address each issue in turn.

### The Factual Background

The decedent, Clyde L. Rinaldi, died testate on November 25, 1988, survived by his wife, Nelle M. Rinaldi, his son, William S. Rinaldi, Sr., and several grandchildren. His will was admitted to probate on December 21, 1988. Rinaldi's wife and son were nominated under the will and qualified by the local probate court to serve as co-personal representatives of the estate.

Rinaldi served for many years as the chief executive officer of the Rinaldi Printing Company. The printing company was founded in 1905 by Rinaldi's father, and was incorporated in 1963 under the laws of Florida. On March 14,1983, when the will was executed, Rinaldi's son served as the company's chief executive officer, while Rinaldi served as the director. At that time—and on the date of his death as well—Rinaldi owned 52.06 percent of the company's capital stock. At the time of the will's execution, the company had a history of paying no dividends. As of December 31, 1988, the book value of the company was $5,340 per share, while its fair market value was $5,389 per share—giving Rinaldi's shares a total book value of $1,390,-178 and a fair market value of $1,520,067.

After directing payment for his burial, debts, and administration expenses, as well as devising his tangible personal property to his wife, Rinaldi's will addressed the disposition of his ownership in the printing company. The will first provided that if Rinaldi's wife failed to survive him, and his son did survive him, the stock would be devised outright to his son. However, if his wife survived Rinaldi, then the stock would go to the "Nelle M. Rinaldi Trust" ("the Trust"), the net income of which was to be payable to his wife at least annually. At her death, the Trust was to terminate, and the stock distributed outright to his son. If his son failed to survive Rinaldi's wife, then the income of the Trust was to be accumulated after the wife's

---

1. Plaintiff also seeks a refund based on the deductibility of amounts representing increased administrative expenses incurred after the estate tax return at issue was filed, as well as the interest paid on a loan, the proceeds of which were used to pay federal estate and state inheritance taxes. Briefing has been postponed as to these aspects of plaintiff's claim, as the parties expect that they can be resolved without the court's intervention.

death and later distributed with the stock to Rinaldi's grandchildren.

The son was nominated as trustee of the Trust, but his authority to manage the Trust was made subject to several conditions. As long as the son continued in the day-to-day management of the company, the voting rights of the stock were to be vested in him. But if, for any reason, the son became unwilling or unable to continue active management of the company, the voting rights were to be vested in Rinaldi's wife, or, if she was no longer living, in the fiduciary of the Trust. Additionally, as soon as practicable after the son gave up day-to-day management, the fiduciary of the Trust was to offer to sell the Trust's stock to the son at book value. If the sale to the son was not effectuated, then the fiduciary was to select other potential buyers and offer reasonable terms for the stock's sale. The will went on to provide that:

> I hereby authorize but do not direct my Personal Representative to elect that the property (Rinaldi Printing Company capital stock) constituting the principal of this Trust be treated as qualified terminable interest property for the purpose of qualifying for the marital deduction allowed in determining the federal estate tax upon my estate.

The rest of Rinaldi's property was divided between two residuary trusts: the Exemption Equivalent Trust ("the EET") and the Residuary Trust. The property chosen to fund the EET was to equal in value the unified credit against the federal estate tax. See § 2010(a). The net income of the EET was to be paid to Rinaldi's wife and living descendants, according to the trustee's discretion, as long as his wife had income sufficient to maintain her standard of living. At his wife's death, the principal and undistributed net income of the trust were to be distributed in two equal parts—one to Rinaldi's son William, and the other in trust for the benefit of the issue of Rinaldi's deceased son Clyde. The value of the assets chosen to fund the EET amounted to approximately $600,000.

The balance of Rinaldi's estate went to the Residuary Trust, out of which were to be paid the debts, taxes, and expenses of the estate. The net income of this trust was to be paid at least quarterly to his wife during her lifetime, and the trustee was authorized to invade the corpus for her benefit. Rinaldi gave his wife a general power of appointment over the corpus of the trust, exercisable during her life or through her will. The portion of the corpus over which she did not exercise her appointment power was to be distributed in the same manner as the EET corpus. The value of the assets chosen to fund the Residuary Trust amounted to approximately $370,000.

Subsequent to the execution of Rinaldi's will, the company elected corporation status for federal income tax purposes, effective on January 1, 1987. Under the Tax Code, stockholders of an S corporation were allowed to include trusts which acquire shares by operation of a will, "but only for the 60-day period beginning on the day on which such stock [was] transferred to it." § 1361(c)(2)(A)(iii).[2] Thus, if the trust established by Rinaldi maintained ownership of his shares, the company would lose its S corporation status and thereby incur a heavier tax burden.

On November 22, 1989, eleven months after Rinaldi's death, the directors of the company approved a redemption of Rinaldi's shares from the Trust. On the same date, Rinaldi's son, as trustee, entered into an agreement with the company to redeem the shares. The company agreed to pay the trust $1,520,067 for the shares, with $100,000 paid at the closing and the balance paid in quarterly installments over a 20-year period, with 8.5 percent interest. Following the closing, the trust was to have no further ownership or participating interest in the company other than as a creditor. Rinaldi's son signed the agreement in his capacities both as trustee and as the company's president. On January 2, 1990, Rinaldi's shares were transferred from the estate to Rinaldi's son, as trustee of the Nelle M. Rinaldi trust.

**2.** On August 20, 1996, § 1361(c)(2)(A)(iii) was amended to substitute a 2-year period for the previously allowed 60-day period. See Pub.L. No. 104–188, § 1303(1), 110 Stat. 1779.

On January 15, 1990, the shares were retired pursuant to the redemption agreement.

On Rinaldi's federal estate tax return, filed on November 29, 1989, his estate reported a transfer tax liability of $107,267.32. This included the election of a Qualified Terminable Interest Property marital deduction of $1,520,067, representing the value of Rinaldi's shares that had been devised in trust. In examining the return, the IRS ruled that the devised shares did not qualify for the claimed deduction. On April 10, 1992, and October 30, 1992, Rinaldi's estate (hereinafter "plaintiff") deposited a total of $544,715.68 toward its anticipated liability stemming from IRS adjustments to its return, including the Qualified Terminal Interest Property denial. On September 8, 1992, the IRS issued a statutory notice of deficiency to plaintiff, asserting an increase of $642,737 in plaintiff's estate tax. The first notice of deficiency was subsequently rescinded and plaintiff's tax liability, reduced after adjustments to $387,520.08, plus $135,868.07 in interest, was assessed against plaintiff on November 10, 1992.

On June 17, 1993, plaintiff filed a claim with the IRS for a refund of taxes of approximately $394,884, plus interest. The IRS disallowed the claim by letter dated August 6, 1993. On August 2, 1995, plaintiff filed its complaint with this court.

*The Statutory Framework*

The Internal Revenue Code ("I.R.C.") imposes a tax "on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States." § 2001(a). The taxable estate equals the value of the taxpayer's gross estate—consisting of all of the taxpayer's property at the time of his death, *see* § 2031(a)—minus any applicable deductions. *See* § 2051. Among the deductions available to a taxpayer is one which allows the taxpayer to reduce the taxable value of his gross estate by "an amount equal to the value of any interest in property which passes or has passed from the decedent to his surviving spouse," provided that the interest is included in initially determining the value of the gross estate. § 2056(a). This "marital deduction" allows the postponement of tax on the property until the surviving spouse disposes of the property, whether by transfer inter vivos or at death.

To ensure that none of the property escapes taxation, the Code contains an exception to this marital deduction, which disallows deductions for property devised to the surviving spouse through the grant of a "terminable interest" in the property. Generally, these are interests which will fail with the lapse of time, or upon the occurrence of an event or condition. *See* § 2056(b)(1). A prime example of such an interest is the life estate. Because a life estate terminates upon death, the subject property would not be included in the gross estate of a surviving spouse. That property could thereby escape taxation altogether if a deduction of its value by the owner-spouse were allowed.

Several "counter-exceptions" to the general prohibition of terminable interest deductions exist, however. Among these is the Qualified Terminable Interest Property ("QTIP") deduction created by Congress in 1981. The Code defines QTIP as property (i) which passes from the decedent, (ii) in which the surviving spouse has a qualifying income interest for life, and (iii) to which an election is made on the estate's tax return. *See* § 2056(b)(7)(B)(i). The Code, in turn, defines a "qualifying income interest for life" as one by which the surviving spouse is entitled to all the income from the property, payable at least annually. Further, no person may have power to appoint any part of the property to any person other than the surviving spouse, unless the power is exercisable only at or after the surviving spouse's death. *See* § 2056(b)(7)(B)(ii). Once made, an election to claim a marital deduction for QTIP is irrevocable. *See* § 2056(b)(7)(B)(v).

*Discussion*

Defendant asserts that the IRS was correct in disallowing plaintiff's claimed QTIP deduction because the testamentary scheme established by Rinaldi failed to meet the statutory requirements for QTIP eligibility. Specifically, defendant argues that the Trust established by Rinaldi's will did not give rise to the "qualifying income interest for life" to which the surviving spouse must be entitled in order to qualify under § 2056(b)(7). In

the event that Rinaldi's son ceased day-to-day management of the company, the will obligated him, as trustee, to offer to sell the stock to himself at book value—a price substantially below the fair market value of the stock at the time. Such a transaction would effectively diminish the value of the trust's corpus, a potentiality which runs counter to the QTIP requirement that "no person has a power to appoint any part of the property to any person other than the surviving spouse." § 2056(b)(7)(B)(ii)(II).

According to defendant, the bargain sale would reduce the Trust's principal and remove property from the wife's estate. This, in turn, would permit property which had already avoided taxation in Rinaldi's estate through the QTIP election to escape taxation in his wife's estate as well. As defendant correctly points out, the intent of the QTIP provision "is to permit property to escape taxation from the estate of the first spouse to die, so long as the property unused during the lifetime of the surviving spouse is included and taxable in her estate."

Plaintiff does not contest defendant's portrayal of the QTIP provisions, but rather argues that changed circumstances have brought the Trust established by Rinaldi's will into full compliance with the statutory requirements. Because the company would lose its tax-reducing S corporation status if the Trust maintained its ownership of Rinaldi's shares, the parties entered into a stock redemption agreement on November 22, 1989—one week before the QTIP election was made through the filing of plaintiff's estate tax return. As such, at the time of the election, plaintiff argues that the Trust owned none of the shares, and Rinaldi's son thus had no right to purchase them at a bargain price. With no possibility of a bargain sale, according to plaintiff, the corpus of the trust was not subject to diminution, and no obstacle to QTIP eligibility remained.

■ The initial question for the court, then, is to determine the point at which property must be statutorily eligible for QTIP treatment. If eligibility must be attained at the time of the testator's death, then the court in this case need only look to the terms of the will, and to the right grant-

ed thereunder giving the son the opportunity to purchase the Trust's shares at a price below fair market value. Under this approach, the inquiry would end at that point, as the property would clearly fall short of the QTIP non-diminution requirements. If, however, property's QTIP eligibility should not be judged until the estate's executor elects such treatment, then the court's inquiry will expand to include those events occurring subsequent to the testator's death that, according to plaintiff, cured the property's ineligibility.

■ A long line of cases echoes the principle that, in general, "qualification for the marital deduction must be determined as of the time of death." *Jackson v. United States*, 376 U.S. 503, 508, 84 S.Ct. 869, 872, 11 L.Ed.2d 871 (1964). *See also Estate of Wycoff v. Commissioner*, 506 F.2d 1144, 1149 (10th Cir.1974) ("[I]n determining whether an interest of the surviving spouse is entitled to the marital deduction, the time of death of the decedent governs the tax consequences."); *Murray v. United States*, 231 Ct.Cl. 481, 687 F.2d 386, 393 n. 8 (1982) ("[T]he tax consequences are to be determined as of the time of death of the decedent."). If the trust does not satisfy the statutory requirements at the time of the relevant transaction—usually the death of the decedent—"deductibility of the bequest in controversy cannot hang suspended pending later events." *Estate of Weisberger v. Commissioner*, 29 T.C. 217, 221–22, 1957 WL 970 (1957).

Defendant's reliance on this line of cases, though well-founded, does not adequately address the circumstances presented by the QTIP election in this case. Because courts in cases like *Jackson* "ruled on the proper determination date for an interest which is not an exception to the [terminable] interest rule, and not subject to a later election, we do not think [they are] dispositive of this issue." *Estate of Spencer v. Commissioner*, 43 F.3d 226, 231 (6th Cir.1995). In most situations in which a marital deduction is sought, the final event of any relevance will be the testator's death. In contrast, when QTIP treatment is sought by a taxpayer's estate, one of the prerequisites is that an

election have been made on the estate tax return—an event which naturally cannot take place until after the testator's death. Several courts have recognized this event as being of significance sufficient to justify postponing the QTIP eligibility determination until its occurrence.

In *Spencer*, the taxpayer's will did not designate specific property to receive QTIP treatment, but rather granted his executor the authority to decide what amount of property would be subject to QTIP treatment when the time came to make the election. The IRS argued that because the executor had the power to decide how much property would go to the QTIP trust, she "possessed an impermissible power to appoint property away from the surviving spouse for the interim period from decedent's death until the date of the QTIP election." *Id.* at 227.

The court rejected this argument, noting first that "[i]t is often impossible to prudently designate what should be committed as QTIP far in advance of death." *Id.* at 228. Further, because "no property meets the definition of QTIP until the proper election is made, and no QTIP election can be made until the estate tax form is filed," *id.* at 231, then logically "no property anywhere can meet the definition of [QTIP] until after the decedent's death." *Id.* at 228. As such, the court reasoned, it would be "contrary to the policy and meaning of the statute, as well as counter-intuitive and against common sense, to apply the definition before the election can be satisfied." *Id.* Therefore, the court held that "the date of election is the proper date for deciding if property meets the requirements set out under § 2056(b)(7)." *Id.*[3]

As to the nature of the QTIP election itself, the court expressed its view as follows:

> The IRS would have us adopt an interpretation that would force property to satisfy every requirement for the QTIP counter-exception on the date of decedent's death except the requirement of election. This would effectively reduce the election requirement to a mere formality, defeat its

apparent purpose and its most reasonable interpretation.

Other courts have also refused to invalidate a QTIP election when the subject property is not explicitly defined at the time of the testator's death. In *Estate of Clayton v. Commissioner*, 976 F.2d 1486, 1490 (5th Cir. 1992), the testator's will provided that any property for which a QTIP election was not made would go into a non-QTIP trust. The IRS took the position that this power of the executor to divert part of the estate's property away from a QTIP trust was " 'tantamount' to a power of appointment to the testator's children." *Id.* at 1497. The court disagreed, finding the IRS's argument to be "flawed logic and deliberate disregard of the plain wording of [the statute]," *id.*, and noting "the overarching truism that many acts must be done and many facts must be determined after the death of the testator in order to determine the taxable estate." *Id.* at 1498. *See also Estate of Robertson v. Commissioner*, 15 F.3d 779, 781 (8th Cir.1994) ("We believe the [executor's] right to make or refrain from making a QTIP election is not a prohibited 'power to appoint.' ").

The logic of this line of cases is readily apparent in light of the policies underlying the QTIP legislation. Congress enacted § 2056(b)(7) primarily to allow a testator to provide for a surviving spouse while maintaining control over the ultimate disposition of his or her property following the surviving spouse's death. *See* H.R.Rep. No. 97-201, at 159–60 (1981), U.S. Code Cong. & Admin. News at 105, 258–59. Under prior law, a testator was forced to choose between leaving property outright to his or her surviving spouse, in which case the property would not be included in the taxable estate, and leaving the property to his or her surviving children, in which case it would be taxed at the testator's death. Under the enacted QTIP provision, a testator may give the surviving spouse the benefit of the property for his or her lifetime without also granting the discretion to direct the ultimate disposition of the prop-

---

**3.** Following *Spencer*, the IRS issued temporary regulation § 20.2056(b)–7T(d)(3)(ii), which provides that, for decedents whose estate tax returns are due to be filed after February 18, 1997, an

otherwise qualifying income interest that is contingent on an executor's election will not be precluded from QTIP status under the requirements of § 2056(b)(7).

erty away from the testator's intended beneficiaries.

In offering this tax-deferral opportunity, Congress was careful to include several important conditions within the statutory framework. Most important to our inquiry was its requirement that no person have the "power to appoint any part of the property to any person other than the surviving spouse." § 2056(b)(7)(B)(ii)(II). This provision does not reflect a congressional purpose of ensuring the financial stability of the surviving spouse, for "[i]f the intention had been to dangle the carrot of deductibility in front of testators to induce them to ensure the financial well-being of the surviving spouse, Congress would surely have given the power to make the QTIP election to the surviving spouse, not the executor." *Clayton, supra,* at 1498. Rather, the restriction's inclusion is to ensure that QTIP property does not escape taxation in the surviving spouse's estate, apart from that portion of the corpus used in furtherance of the surviving spouse's well-being. Congress was not concerned with that portion of the estate's property that, for whatever reason, is ineligible for QTIP treatment because "that property is taxed right where the Commissioner and Congress want it taxed—in the estate of the first spouse to die." *Id.*

There is no compelling reason to prohibit QTIP treatment for those assets whose election is left up to the discretion of the executor. If the executor includes a particular asset in the QTIP trust established by the testator's will, then the asset will be taxed in the estate of the surviving spouse. If the executor declines to elect QTIP status for an asset, then it will be taxed in the testator's estate. Congressional objectives thus do not require that the status of a particular asset be determined at the time of the testator's death. As long as property's QTIP eligibility is ascertainable when the executor elects such treatment in the estate tax return, postponing the eligibility determination until that time runs afoul of neither the plain meaning of the statute's language, nor its underlying objectives.

Thus, the court rejects, as a general proposition, defendant's blanket assertion that property's QTIP eligibility must be judged at the time of the testator's death. In cases like *Spencer, Robertson,* and *Clayton,* courts have sensibly allowed property's eligibility to be determined at the time of its QTIP election. However, accepting the holdings of those courts does not invariably lead to a finding for plaintiff in this case. The factual circumstances on which the reasoning of *Spencer* and its progeny were based differ dramatically from the circumstances presented by the case at hand. In *Spencer,* for example, the terms of the testator's will clearly established a valid QTIP trust—the only ambiguity stemmed from the discretion granted to the executor to decide what amount of property to contribute to the trust. *See* 43 F.3d at 227.

█ In this case, by contrast, the trust established by the terms of Rinaldi's will was clearly ineligible for QTIP treatment—the will explicitly subjected the trust's value to diminution through the potential sale of its assets at a bargain price to someone other than the surviving spouse. It is only because the terms of the will apparently no longer dictate the make-up of the trust that plaintiff now can assert QTIP eligibility. Because the printing company would have lost its S corporation status—thereby gaining a heavier tax burden—if the trust became a permanent stockholder of the company, the interested parties arranged for the redemption of the shares at a price reflecting their fair market value. As a result, the corpus of the QTIP trust consisted of money, not stock. Because the trust owned no shares, it logically could not sell them to anyone, much less at a bargain price. According to plaintiff, this negated any possibility that a portion of the trust would be appointed to someone other than Rinaldi's wife during her lifetime, thereby remedying the only deficiency of the trust.

The difficulty with accepting plaintiff's characterization stems from the means by which the trust's defect was allegedly remedied. The trust may indeed have rid itself of the troublesome stock in question; what remains unchanged, however, are the terms of the will that rendered the trust ineligible for QTIP treatment in the first place. There

exists no legal impediment to the trust's ownership of the printing company's stock. Rather, it is only the company's desire to continue as an S corporation that led to the shares' redemption. And it is only the maintenance of that desire which keeps the trust's defect from again rising to the surface. For example, if a change in tax law were to diminish the disparity between "S" corporations' and "C" corporations' relative tax burdens, thereby making the company's continued operation as an·S corporation significantly less desirable, there is nothing to prevent the trust from reacquiring shares of the company. In the event of such a reacquisition, the terms of Rinaldi's will presumably would still govern. Under those terms, the shares potentially would be subject once again to a bargain sale to Rinaldi's son or a third party, thereby diminishing the corpus of the trust. The portion of the trust's corpus lost in the bargain sale would have escaped taxation in both Rinaldi's and his surviving spouse's estates—the very potentiality which the statutory QTIP requirements were implemented to avoid.

 Granted, the likelihood that Rinaldi's trust will reacquire the company's stock, and that his son will quit the company's management—thereby spurring the bargain sale—may be remote. But when it comes to judging QTIP eligibility, "it is the possibility, not the probability, that an interest will terminate or fail that will determine whether the surviving spouse's interest is a 'qualifying income interest for life.'" *Estate of Kyle v. Commissioner*, 94 T.C. 829, 845, 1990 WL 77198 (1990). Because deductions, whether from income or estate taxes, are "a matter of legislative grace," the taxpayer must meet every condition of eligibility set forth by Congress:

> It is not enough that such conditions are nearly met, or that a potentiality inconsistent with the legislative mandate is unlikely to actually become operative. The taxpayer may not haggle with Congress; he either fits squarely within the statute in every particular or the deduction is unavailable.

*Estate of Weisberger v. Commissioner*, 29 T.C. 217, 220, 1957 WL 970 (1957). This mindset has led courts to take consistently firm stances against QTIP treatment for trusts failing to meet one of § 2056's requirements. *See Estate of Doherty v. Commissioner*, 95 T.C. 446, 460–61, 1990 WL 155450 (1990) (rejecting QTIP treatment for trust where surviving spouse had discretion as trustee to accumulate all or part of trust income for distribution to others upon his death), *rev'd on other grounds*, 982 F.2d 450 (10th Cir.1992); *Estate of Bowling v. Commissioner*, 93 T.C. 286, 296, 1989 WL 99847 (1989) (rejecting QTIP treatment for trust where trustee was authorized to invade trust corpus during life of surviving spouse to provide for emergency needs not only of surviving spouse, but also of decedent's surviving son and brother).

This potential reemergence of the trust's defect reflects an even more fundamental problem with the approach to QTIP eligibility advocated by plaintiff. Plaintiff is asking this court to judge property's QTIP eligibility solely on the basis of the factual circumstances in place at the time of the executor's election, regardless of the specific terms of the testator's will. Under plaintiff's approach, ad hoc measures enacted after the testator's death by the executor would effectively negate the memorialized intent of the testator, no matter how contrary that intent was to the letter and spirit of the QTIP requirements. In *Spencer, Clayton,* and *Robertson,* the testators' memorialized intent was to allow their executors to decide whether or not to elect QTIP status as to a particular asset—importantly, however, every aspect of their wills' terms was consistent with QTIP eligibility. Here, in contrast, Rinaldi's explicit intent was to allow his wife's trust to operate in a manner clearly inconsistent with § 2056(b)(7)'s criteria. To say the least, it would take a generous reading of tax law by the court to extract a legally viable QTIP trust from the facially invalid framework set forth by the testator. Such a reading, in this court's view, is not feasible.

Courts have long noted that the "achievement of the purposes of the marital deduction is dependent to a great degree upon the careful drafting of wills." *Jackson v. United States*, 376 U.S. 503, 511, 84 S.Ct. 869, 873,

11 L.Ed.2d 871 (1964); *see also Estate of Wycoff v. Commissioner,* 506 F.2d 1144, 1149 (10th Cir.1974) ("[T]he marital deduction is to be strictly construed."). The QTIP criteria at issue in this case come from "the precise language of a precise statute." *Estate of Howard v. Commissioner,* 910 F.2d 633, 635 (9th Cir.1990). In creating the underlying framework allowing marital deductions subject to the terminable interest rule, Congress "chose a technique which required the draftsmen of testamentary instruments to be meticulous in adhering to the formal requirements of section 2056." *Allen v. United States,* 359 F.2d 151, 153 (2d Cir. 1966).

In addition to requiring precision in the crafting of a will's terms, courts interpreting QTIP provisions place an unmistakable emphasis on the expressed intent of the testator. In *Estate of Cavenaugh v. Commissioner,* 51 F.3d 597 (5th Cir.1995), the testator's estate, in an effort to reduce the subsequent tax burden faced by the surviving spouse's estate, argued that its own QTIP election, previously allowed by the IRS, had been improper. The estate argued that some of the QTIP trust's income might have gone to the testator's descendants, rather than being distributed currently to the surviving spouse, as required by § 2056(b)(7)(B)(ii)(I). This possibility existed, according to the estate, because no provision of the testator's will, nor of state law, prohibited the accumulation of the trust income. *See id.* at 600. The court found no significance to the lack of an express prohibition, reasoning that, in determining property's QTIP eligibility, "[w]hether the surviving spouse is entitled to all the income is not measured by an abstract principle of law but merely by reference to the decedent's intent." *Id.* at 601. "In other words," the court went on to explain, "whether [the testator] intended that [the surviving spouse] receive all of the income from these property interests and whether she did—or did not—authorize any other person to appoint part of this property to somebody other than her spouse is dispositive." *Id.*

When measured against these twin strains of judicial analysis—emphasizing the will's language and the testator's intent—Rinaldi's will falls short. The terms of the will are precise, but their precision sets forth a framework directly contradictory to the statutory requirements for QTIP eligibility. And Rinaldi clearly intended to establish the trust with a condition that would render it ineligible for QTIP treatment. Regardless of his motivation, he did not want his wife's trust to be made up of the printing company's stock in the event that his son no longer participated in the company's management. To bring this about, he was willing to arrange a bargain sale of the shares to his son—an arrangement that violates both the letter and spirit of § 2056(b)(7).

Plaintiff would have us ignore both the terms of the will and the intent of the testator, and focus solely on the factual circumstances as they happened to exist at the time of the QTIP election. The court, however, does not believe that the inquiry into a trust's QTIP eligibility can be divorced from the testamentary framework from which it arose. It is one thing to allow the testator—as the court did in *Spencer,* for example—to defer the identification of particular QTIP assets until after his or her death, when an account of the estate can be made. In those situations, recognizing the validity of the resulting QTIP trust is consistent with the terms and underlying tax policies of § 2056, as well as the intentions and instructions of the testator. It is quite another matter to allow the executor to step in and point to a post-mortem, circumstantial change in the QTIP trust as a remedy for an obvious flaw created by the terms of the trust itself, as set forth in the will.

■ The trust in this case is inherently ineligible for QTIP treatment due to the provision of Rinaldi's will allowing the bargain sale of the trust's stock to a third party; the fact that the trust presently does not own the shares subject to the defective provision in question does not negate that provision's effect. Postponing the eligibility determination until the time of the executor's QTIP election—regardless of whether such postponement is legally valid—would still leave the court facing a trust with operating terms clearly contrary to the explicit criteria of § 2056(b)(7). The court holds that the com-

pany's post-mortem redemption of the shares devised to the trust by Rinaldi's will did not bring the trust into compliance with the statutory requirements for QTIP eligibility.[4] Thus, the IRS was correct in ruling that the trust property did not qualify for a QTIP marital deduction.

### The Orange Grove Freeze

*The Factual Background*

At the time of his death in November 1988, Rinaldi owned two citrus groves in Polk County, Florida. In December 1988, the fair market value of these groves was appraised by John C. Husted, the production manager of the Waverly Growers Cooperative, the company charged with the groves' management. At the time of the appraisal, Grove No. 327, a 20–acre plot of land, was planted with 547 Valencia orange trees and 331 Midseason orange trees. Grove No. 328, a 44–acre plot of land, was planted with 1,299 Marsh grapefruit trees, 64 Duncan grapefruit trees, 1,163 Hamlin orange trees, and 652 Valencia orange trees.

In calculating the value of the groves, Husted used an "income production" method, measuring the present value of the income-producing capability of the trees by projecting future net revenues discounted to present value. He included several variables in his calculations, including a tree's age and expected returns from its fruit. The appraisal categorized the trees according to age and variety, and assigned a market value to each group based on the number and average value of the trees in that group. For example, in Grove 327, Husted found 281 "mature" Midseason orange trees to have a per-tree value of $188.79, resulting in a total group value of $53,049.99. Husted repeated this calculation for all five tree groups in Grove 327, and for all ten tree groups in Grove 328. The sum of figures for all the groups would lead to a total representing the market value of both groves as of the date of Rinaldi's death.

In December 1989, during the administration of Rinaldi's estate, the area in which the groves were located suffered a major freeze. Temperatures in the groves fell below 28 degrees Fahrenheit for several hours over a period of three days, destroying or severely damaging many of the citrus trees. From February through April of 1990, Waverly employees, supervised by Husted, assessed the extent of the freeze damage to the two groves. Based on their observations, Husted calculated the post-freeze value of the remaining trees, using the same methods and variables as he used in his pre-freeze evaluation. The results reflected substantial losses. For example, in Grove 327, where Husted had previously found 281 "mature" Midseason orange trees to have a per-tree value of $188.79, there were now only 199 such trees,

---

4. Alternatively, plaintiff argues that Rinaldi's will contained an ambiguity—that Rinaldi clearly intended the Trust's assets to be available for a QTIP election, but that this conflicted with the existence of the son's potential right to a bargain sale of the stock. Under Florida law, this ambiguity should be resolved, according to plaintiff, by deferring to whichever provision occurs later in the will: "If there is an irreconcilable conflict between two provisions in a will, the latter provision will usually prevail as being the last expression of the intentions of the testatrix where the provisions refer to the same subject matter." *Dutcher v. Estate of Dutcher*, 437 So.2d 788, 790 (Fla.Dist.Ct.App.1983). In this case, the authorization of a QTIP election is the later provision.

The court finds no merit in plaintiff's argument. According to plaintiff, paragraph D of Article Four of Rinaldi's will "makes a very clear statement of a purpose to require the trust property to continue to constitute 'qualified terminable interest property.'" That paragraph, in its entirety, reads as follows:

I hereby authorize *but do not direct* my Personal Representative to elect that the property (Rinaldi Printing Company capital stock) constituting the principal of this Trust be treated as qualified terminable interest property for the purpose of qualifying for the marital deduction allowed in determining the federal estate tax upon my estate.

(emphasis added).

Clearly, the testator has left the QTIP election up to the discretion of the executor. There is no indication that the executor is required to make such an election, or that any provisions of the will that might preclude QTIP status should be struck. This grant of discretion, taken together with the earlier provision directing the bargain sale of the trust's stock, does not give rise to an ambiguity, much less lead to the "irreconcilable conflict" required by the language of *Dutcher*, 437 So.2d at 790.

having a per-tree value of only $76.24. The total post-freeze value of the "mature" Mid-season orange trees was $15,171.76—an amount nearly $38,000 below their estimated value before the freeze.

The post-freeze application of the "income production" method of appraisal resulted in the assignment of below-zero values to several tree groups. In Grove 328, for example, Husted assigned a post-freeze value of -$44.96 to 223 "reset" Marsh grapefruit trees, resulting in a total group value of -$10,026.08—an amount nearly $11,000 below the trees' estimated pre-freeze value of $824.80. The negative values signify trees for which the costs of care and upkeep would be higher than the anticipated revenues they would generate over their lives—*i.e.*, the damage to such a tree would prevent it from ever breaking even in a financial sense.

In its claim for partial refund of estate taxes, plaintiff sought a casualty loss of $331,331.78, representing the difference between the appraised date-of-death and post-freeze values of its citrus trees. The IRS, during its examination of the estate, disallowed any loss in excess of the date-of-death values of the trees. In other words, in its calculation of plaintiff's total loss, the IRS did not include the negative post-freeze values assigned by plaintiff to particular tree groups; rather, the IRS treated those groups as if their appraised post-freeze values were zero. This adjustment by the IRS reduced plaintiff's claimed loss by $39,895.07.

The IRS also deducted $11,997 from the recovery sought by plaintiff, which was the amount applied to plaintiff's account with Waverly Growers from the federal tree assistance program. The remaining claimed loss of $279,440 was allowed (plus an additional $42 due to a typographical error and rounding). Plaintiff here seeks to recover an amount representing the increased tax liability it incurred through the disallowed portion of its casualty losses.

*The Legal Framework*

■ For purposes of determining an estate's tax liability, I.R.C. § 2054 grants a deduction from the value of the gross estate for "losses incurred during the settlement of estates arising from fires, storms, shipwrecks, or other casualties, or from theft, when such losses are not compensated for by insurance or otherwise." A taxpayer seeking a deduction for such losses bears the burden of proving both the "existence and extent of the casualty loss, as well as the amount of such loss to be taken into account." *Westvaco Corp. v. United States*, 225 Ct.Cl. 436, 639 F.2d 700, 707 (1980).

The general rule for calculating the proper amount of a casualty loss deduction is set forth in Treas. Reg. § 1.165–7(b)(1)[5]:

General Rule. In the case of any casualty loss whether or not incurred in a trade or business or in any transaction entered into for profit, the amount of loss to be taken into account for purposes of section 165(a) shall be the lesser of either—

(i) The amount which is equal to the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty; or

(ii) The amount of the adjusted basis prescribed in § 1.1011–1 for determining the loss from the sale or other disposition of the property involved.

In general, the basis of property "shall be the cost of such property," § 1012, with upward adjustments made for amounts spent on improving the property, such as seeding or planting, and downward adjustments made for any depreciation deductions taken. *See* § 1016. The basis of property "in the hands of a person acquiring the property from a decedent or to whom the property passed from a decedent," however, is "the fair market value of the property at the date of the decedent's death." § 1014.

In calculating the amount of a casualty loss, Treas. Reg. § 1.165–7(b)(2) requires that the determination be made "by refer-

---

**5.** Treas. Reg. § 1.165–7(b)(1) corresponds to I.R.C. § 165, which is the provision governing casualty loss deductions from a taxpayer's in-

come tax liability. The stated rule, however, applies equally in the estate tax context.

ence to the single, identifiable property damaged or destroyed." The issue before the court centers on the determination of what measure of plaintiff's property is the appropriate single, identifiable property by which to measure plaintiff's casualty loss.

*Discussion*

Defendant argues that, "to determine the allowable loss occasioned by the December 1989 freeze, the appropriate unit of property, separately identified, must be the individual tree." Plaintiff calculated its date-of-death and post-freeze grove values by grouping trees according to variety and age, and then establishing a per-tree value. "Therefore," according to defendant, "it is both reasonable and logical to use the same property unit for measuring the estate's casualty loss." Further, defendant points out that Waverly Growers' records are also maintained tree by tree, grouped by age and variety, and that its application to the federal tree assistance program "was based on the rehabilitation work performed on each tree, grouped by age." As such, the individual trees "are the appropriate units for measuring the loss plaintiff's citrus investment suffered from the freeze."

If defendant's suggested tree-by-tree approach is adopted by the court, then defendant will be entitled to judgment on this issue. For if plaintiff's casualty losses are properly calculated only along the lines of the categories under which plaintiff's appraisals were conducted, then the IRS was correct to deny recovery for any negative values assigned to particular groups. This follows from the common-sense notion that the casualty-loss deduction cannot be used by an estate to recover an amount for damage that is greater than the date-of-death value of the property in the first place. *See* Treas. Reg. § 1.165–7. Defendant points out that the IRS fully allowed plaintiff's claimed losses to the extent of each tree's date-of-death value. Allowing a greater recovery would, according to defendant, contradict the established tax principle "that a deductible loss cannot exceed basis."

Not surprisingly, plaintiff disagrees with defendant's characterization of the proper economic unit by which to measure plaintiff's losses. Essentially, plaintiff argues, defendant has broken down the appraisals "into non-economic units for [the] purpose of denying freeze damage losses to certain segments of a grove which is functioning as a single economic unit." Plaintiff claims that such a breakdown is "not only mathematically inaccurate," but also "legally improper." According to plaintiff, the casualty losses calculated for the grove as a whole must be accounted for in awarding the proper deduction. Under this approach, plaintiff would be entitled to judgment on this issue. In effect, the positive post-freeze values assigned to certain tree groups would offset the negative post-freeze values assigned to other tree groups, resulting in a positive value for the grove as a whole. As such, plaintiff would realize a tax benefit from the negative values because the claimed casualty-loss deduction for the grove as a whole would still not exceed the grove's date-of-death value.

As plaintiff correctly emphasizes, what the I.R.C., in allowing a taxpayer to deduct casualty losses from its taxable estate, "envisions is a loss of capital, a true economic loss to the taxpayer for which he is allowed a deduction not exceeding his adjusted cost basis." *Westvaco Corp. v. United States*, 225 Ct.Cl. 436, 639 F.2d 700, 705 (1980). There can be no tax benefit gained "from mere paper losses or anticipated future profits, or losses of property for which [plaintiff] has no basis." *Id.*, 639 F.2d at 707. Rather, "plaintiff's calculation of the loss can only represent the change in fair market value attributable to the damage or destruction." *Id.*

These truisms, while helpful, do not lend an answer to the question at hand. If plaintiff's appraisal is broken down by variety and age of trees, then the deduction of the negative group values would amount to a recovery of mere paper, or non-economic, losses. However, if the various groups are viewed as an aggregate whole, then the previously negative values regain economic meaning due to the groves' ultimately positive post-freeze worth. Hence, the issue's disposition still lies in determining the appropriate economic unit by which the casualty losses should be measured.

The citrus grove cases cited by defendant are similarly unpersuasive. Nowhere in *Knapp v. Commissioner*, 23 T.C. 716, 1955 WL 677 (1955), nor *Krome v. Commissioner*, 9 T.C.M. (CCH) 178 (1950), did the courts address whether a casualty loss deduction should be based on the calculation of damage to a grove in its entirety, or rather to smaller groups of trees within the grove. The court in *Knapp* did not even touch upon the problem at hand; the court held that the taxpayer could not deduct losses for damage to trees that were not planted at the time it acquired the grove, as those trees had no basis from which their post-casualty value could be deducted. *See Knapp*, 23 T.C. at 723.

The court in *Krome*, on the other hand, did uphold a formula used by taxpayers to calculate their casualty losses, and that formula appears to have required the determination of the extent of an individual tree's injury, expressed as a percentage of the tree's basis. However, the percentage losses for the individual trees were then utilized to yield a weighted average of loss suffered by the entire grove, measured as a percentage of the grove's basis. *See id.* at 185. Thus, the individual trees' measurement was used only as an intermediate step in the process of determining the amount of loss for the grove in its entirety. In that sense, *Krome* could be cited just as usefully by plaintiff.

More relevant to this court's inquiry are two cases cited by plaintiff: *Weyerhaeuser Co. v. United States*, 92 F.3d 1148 (Fed.Cir. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 766, 136 L.Ed.2d 713 (1997), and *Westvaco Corp. v. United States*, 225 Ct.Cl. 436, 639 F.2d 700 (1980). In *Westvaco*, the court addressed the proper economic unit by which to measure casualty losses in the timber context. The IRS had argued for a relatively narrow interpretation of "single, identifiable property," by asking the court to consider the relevant property to be units "of merchantable timber contained in the merchantable trees suffering mortal injury"— *i.e.*, essentially calculating the losses one tree at a time. *Id.*, 639 F.2d at 716. The court rejected this approach, ruling that all of the timber in an area, or "block," should be encompassed in the calculation of casualty losses. The court noted that, unlike individual trees, the block "remains constantly identifiable as a unit of property, having an identifiable adjusted basis unaffected by other such units." *Id.* at 717. "We hold," the court concluded, "that the single, identifiable property damaged or destroyed in the case of this plaintiff was all of the standing timber in the area of the individual district directly affected by each casualty." *Id.* at 720.

In *Weyerhaeuser*, again in the timber context, the IRS had defined the "single, identifiable property" as the "tree stand"—a smaller grouping of trees than the "block," and one in which the trees are "sufficiently homogenous to be distinguishable from adjoining growth." *See Weyerhaeuser*, 92 F.3d at 1150. The Court of Federal Claims upheld the IRS's interpretation, declining to follow *Westvaco*. *See Weyerhaeuser Co. v. United States*, 32 Fed. Cl. 80 (1994). The Court of Appeals for the Federal Circuit reversed, ruling that *Westvaco* controlled the case as binding precedent. *See Weyerhaeuser*, 92 F.3d at 1151. The court echoed the *Westvaco* court in extolling the logic of using "the same property unit for casualty loss purposes as had consistently been used for tax accounting purposes." *Id.* "[T]he correct rule," the *Weyerhaeuser* court explained, "is that the single, identifiable property is the depletion block when that property serves for commercial, forest management, and depletion purposes." *Id.*

Defendant discounts the relevance of *Westvaco* and *Weyerhaeuser*, given that both cases involve the application of regulations specific to the timber context. *See* Treas. Reg. § 1.611–3(d)(1) (1996) (providing for establishment of timber "blocks"). On the one hand, defendant is correct in the sense that those decisions do not control the outcome of this case due to the unique regulatory context in which they arose. On the other hand, however, the logical appeal of the reasoning underlying those courts' decisions is by no means diminished by such relatively minor administrative peculiarities.

The holdings of both courts recognized the wisdom of allowing a taxpayer to measure its casualty losses by realistic economic units.

The *Westvaco* court recognized the "block" as a "reasonable and logical and identifiable area affected by the casualty." *Westvaco*, 639 F.2d at 717. And the *Weyerhaeuser* court implicitly accepted the taxpayer's argument that dividing its property into units smaller than blocks would be "a difficult, if not impossible, accounting task, and an unfair and unwarranted way of defeating the purpose of the law to permit deduction of casualty losses up to the adjusted basis of the property that experienced the loss." *Weyerhaeuser*, 92 F.3d at 1150. Further, the timber regulations themselves provide that blocks may be established in accordance with "geographical or political boundaries or by *logical management areas*." Treas. Reg. § 1.611–3(d)(1) (emphasis added). Thus, at the root of both courts' holdings is the idea that the economic unit by which a taxpayer's casualty losses are measured should be of a nature and scope that make practical sense.

At bottom, it is the practical sensibility behind plaintiff's position that compels us to adopt it. Plaintiff's basic argument, that the IRS has split "the grove down into unrealistic economic units" through its tree-by-tree approach, stems from the fact that, according to plaintiff, the individual trees themselves have no market value. Plaintiff claims that the grove in its entirety is the only unit with a realistic market value. Not surprisingly, a determination of market value is the ultimate objective of an appraisal conducted for casualty loss purposes. *See, e.g.,* Treas. Reg. § 1.165–7(a)(2)(i) ("In determining the amount of loss deductible under this section, the fair market value of the property immediately before and immediately after the casualty shall generally be ascertained by competent appraisal.").

Defendant insists that using an individual tree as the economic unit does make sense as a method for calculating the casualty loss. In addition, defendant points out that plaintiff's appraisal was conducted by grouping the trees according to age and variety, that plaintiff admitted to then using a tree-by-tree approach in estimating the loss, and that "plaintiff is bound by the method it used." According to defendant, if plaintiff's tree-by-tree approach—as reflected by Husted's appraisals—were to be rejected by the court, "then plaintiff has not satisfied its burden of proving any deductible loss to the estate from the freeze." (emphasis in original).

In trying to hold plaintiff to a tree-by-tree approach, defendant has overlooked the function and purpose of plaintiff's individualized assessment of freeze damage to its trees. In conducting its appraisal, plaintiff did not treat the individual tree as the relevant economic unit. Plaintiff merely appraised the damage to various trees in order to determine the total grove loss inflicted by the freeze—in plaintiff's final analysis, the entire grove was unmistakably cast as the relevant economic unit. The calculated freeze loss for any particular age or variety of tree was significant only as a component of the total grove loss; isolating those figures, as the IRS did in its determination of plaintiff's allowable deduction, removes them from any meaningful context, and underscores the fact that the individual tree is ill-suited to be the unit by which plaintiff's casualty loss is measured.

This is best illustrated with reference to the appraisal's finding that several trees' post-freeze values were below zero. The conclusion that a group of trees has a value of below zero bears, at first glance, a tenuous relationship to everyday economics, and allowing a tax deduction based on that value may seem nonsensical. The validity of the below-zero figures becomes apparent, however, when the trees in question are acknowledged as small parts of a much larger whole. Basically, the trees' values were calculated by deducting the costs of production and harvesting from the expected income of the citrus. For certain trees, the costs exceeded the expected income due to freeze-induced delays in production, longer recovery periods, and lower expected returns for the fruit. If a grower could perform a cost-benefit analysis for each individual tree, then presumably the grower would not spend any more money on its care if future costs exceeded expected revenue. However, the grower cultivates the entire grove, and cannot simply pick and choose those trees for which continued care makes financial sense. The increased costs and reduced revenues

brought about by the freeze are unavoidable, and are properly reflected in the negative values assigned to certain trees.

Further, the appraisal's results are understandably inaccurate when viewed on a per-tree basis. This stems from the averaging approach necessitated by the methods of appraisal. For example, in calculating the costs of cultivation, Husted included the average amount of fertilizer applied to each tree by the growers' automatic sprayer. In reality, the sprayer automatically senses the size of a particular tree and adjusts the amount of fertilizer applied accordingly. Applying an average figure thus leads to an overestimation of cultivation costs for some trees, and an underestimation for others; the average only leads to an accurate result when cultivation costs are considered for the grove in its entirety.

■ In light of the applicable law's common-sense approach to casualty loss calculation, the practical operation of plaintiff's citrus grove, and the purpose and method of plaintiff's appraisal, the court holds that the IRS, in disallowing the portion of plaintiff's deduction attributable to certain trees' negative post-freeze values, divided plaintiff's property into unrealistic economic units. Under the facts of this case, the freeze damage inflicted on the entire grove must be considered in determining plaintiff's allowable deduction for casualty losses.[6]

### Conclusion

The court holds that plaintiff's QTIP election was invalid under § 2056(b)(7); the clerk is thus instructed to enter judgment in favor of defendant on that element of plaintiff's claim. Further, the court holds that the IRS improperly disallowed a portion of plaintiff's casualty loss deduction stemming from freeze damage to its citrus groves; the clerk is thus instructed to enter judgment in plaintiff's favor in the amount of $39,895.07, plus applicable interest.

---

6. In its response brief, plaintiff also allege that the IRS wrongfully disallowed $11,997 from plaintiff's claimed deduction—an amount given to plaintiff by the federal tree assistance program as compensation for freeze losses. Plaintiff claims that the money was applied against grove losses for later years, and so should not have been deducted from plaintiff's recovery. Regardless of how the money was applied, however, as long as plaintiff received the award as a result of its freeze losses, the IRS was correct to deduct the amount from plaintiff's refund claim. Under § 2054, a taxpayer is entitled to a deduction for only those casualty losses for which compensation has not otherwise been received.